Hardy Lee SWANSON, Nancy I. Swanson, James A. Alsing, and Laura S. Alsing, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 74 Civ. 4692 (JMC).

United States District Court, S. D. New York.

July 6, 1977.
As Amended July 21, 1977.

---

Speiser & Krause, New York City, for plaintiffs Hardy Swanson and Nancy Swanson; by John J. Carlino, New York City, of counsel.

Geoghan, Tutone & Grossman, New York City, for plaintiffs James Alsing and Laura Alsing; by William F. X. Geoghan, and Marc E. Grossman, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant; by Frederick Schaffer, Asst. U. S. Atty., and Gary W. Allen, of counsel.

## OPINION

CANNELLA, District Judge.

Judgment is granted for the defendant after a bench trial on the sole issue of liability.

Plaintiffs brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 et seq., to recover for personal injuries suffered in an airplane crash allegedly caused by defendant's negligence.[1] Because the Court finds that plaintiffs have not proved the Government's negligence by a preponderance of the credible evidence, the complaint is dismissed.

## THE FACTS

On the morning of January 28, 1973 plaintiffs Hardy Lee Swanson and James A. Alsing took off in a Piper Cherokee 180 from Florence, South Carolina, en route to Manchester, New Hampshire. Swanson piloted the plane; Alsing was the sole passenger. Between Florence and Manchester, the two landed at Lancaster, Pennsylvania. From the airport, Swanson made three telephone calls to the Harrisburg Flight Service Station ("HFSS"). The first and third were for weather information; the second was for the purpose of filing a flight plan.

Swanson first called the HFSS at 12:03 p. m. and spoke to Raymond Fitten, one of the flight service specialists. Fitten testified that, although he now had no independent recollection of the day's events, he accurately set forth the content of the weather briefing he gave Swanson in a statement he prepared the day following the accident. According to Fitten's statement, which was admitted into evidence, Swanson was given the following information when he first called the HFSS: the 11:00 a. m. weather for various stations along and in the vicinity of the route of flight;[2] the Terminal Forecasts for these stations, valid from 12:00 noon to 12:00 midnight; and the freezing level and icing conditions from the Bos-

---

1. Plaintiffs Hardy Lee Swanson and James A. Alsing sought recovery for injuries they suffered as a result of the crash. Their wives, Nancy J. Swanson and Laura S. Alsing, sought recovery for "loss of services."

2. These stations are: Lancaster, Pennsylvania; Allentown, Pennsylvania; Poughkeepsie, New York; Windsor Locks, Connecticut; Worcester, Massachusetts; and Boston, Massachusetts.

ton Area Forecast, valid from 8:00 a. m. to 8:00 p. m. Although Swanson testified he never received much of this information, the Court is not persuaded by this bare assertion in light of numerous contrary indications. See *infra*.

The second time Swanson called the HFSS for weather information he spoke to Herbert Humphrey, another flight service specialist. Like Fitten, Humphrey had no independent recollection of the briefing he gave Swanson, but testified that he remembered the substance of that briefing when on January 28, 1973 he drafted a statement after hearing of the crash. According to this statement, Humphrey gave Swanson the following weather information: the 1:00 p. m. weather reports for various stations relevant to the route of flight;[3] the Terminal Forecasts for these stations, valid from 12:00 noon to 12:00 midnight; the Boston Area Forecast for New England, valid from 8:00 a. m. to 8:00 p. m.; icing conditions (freezing level at the surface in New England and Northeast New York); a 12:12 p. m. pilot report from Lebanon, New Hampshire to Providence, Rhode Island; and a winds aloft forecast at 6,000 feet for Westminster, Maryland, Albany, New York and Boston, Massachusetts. The statement also indicates that the weather briefing concluded at 1:55 p. m.

Again, Swanson claims he never received much of the information contained in Humphrey's statement, but the Court finds that Swanson was provided this information when he called the HFSS sometime before 2:00 p. m.

At approximately 2:30 p. m., Swanson and Alsing departed from Lancaster airport. Shortly before takeoff Swanson had some difficulty with one of the aircraft's two radios. After takeoff, but still within range of the Lancaster control tower, Swanson was further alerted to the radio's malfunction when he had trouble communicating with the tower. Although Swanson was aware of both the critical nature of the ability to communicate with air traffic control ("ATC" shall be used to mean air traffic control or air traffic controller, depending on the context) and the difficulty of navigating with only one radio, while operating under an instrument flight plan,[4] he did not discontinue the flight at this time. Another communication difficulty occurred just minutes after takeoff when Swanson attempted to communicate with the Harrisburg approach control. Nonetheless, he determined to make the flight.

Approximately five minutes out of Lancaster, ice began accumulating on the plane.[5] Swanson notified the New York Air Route Traffic Control Center ("N.Y. ARTCC" or "New York Center") that he was picking up light to moderate icing. Although at trial Swanson attempted to minimize the significance of this icing, the definitions of "light" and "moderate" icing as contained in the Airman's Information Manual indicate that even "light" icing may be dangerous to a plane without deicing equipment and that, in a "moderate" icing situation, the use of deicing equipment is a necessity. Swanson's aircraft had no deicing equipment and, indeed, was prohibited from flying in icing conditions. Despite these circumstances, he continued en route to Manchester.

Swanson became aware of the icing encounter's effect on his navigational capabilities when his request for a clearance from 7,000 feet to 9,000 feet was granted; even though the plane was lightly loaded, it was unable to climb past 8,000 feet.[6]

---

3. These stations are: Allentown, Pennsylvania; Wilkes Barre, Pennsylvania; Windsor Locks, Connecticut; Bedford, Massachusetts; Concord, New Hampshire; Poughkeepsie, New York; and Albany, New York.

4. When weather conditions fall below the minimum for flight under visual flight rules, a pilot must proceed under an instrument flight plan; in such circumstances, navigation of the air-

plane proceeds by use of certain navigational instruments.

5. The combination of freezing temperatures and visible moisture (for example, rain or fog) produces icing on the frame of an airplane.

6. The Piper Cherokee 180 has the capacity to reach altitudes of between 14,000 and 16,000 feet. The "light" to "moderate" icing therefore

Thus realizing he would be unable to escape the ice by ascending, Swanson requested a clearance to descend to 5,000 feet. The descent to 5,000 feet placed the plane below the freezing level and the ice disappeared rather quickly.

What the first icing encounter showed Swanson was that the freezing level at his then present location was 7,000 feet. Because he knew that the temperature would decrease as he proceeded in a northern direction, he could expect the freezing level to descend into his present altitude of 5,000 feet as he flew northeastward into New England. Being an experienced pilot, he must have known that, if and when he again experienced some form of visible moisture, he would encounter airframe icing.

It was during the icing encounter, approximately fifteen minutes into the flight, that Swanson for the fourth time experienced difficulty with his second radio, and shut it off completely. He never again attempted to use it, even during the emergency situation immediately preceding the crash. Although this left the airplane with only one radio, Swanson did not believe this to be sufficient cause to terminate the flight. Having only one radio, however, meant he had to switch from one frequency to another in order to determine his location and, at the same time, keep the plane on course.

The flight proceeded uneventfully for more than an hour before Swanson again experienced airframe icing. As he entered a cloud area in the vicinity of the Cantrel intersection at approximately 3:52 p. m. he immediately encountered freezing rain, which is considered the most dangerous inflight weather condition. Although this was the worst icing Swanson had ever seen,

he allowed three minutes to elapse before requesting help from the N.Y. ARTCC by contacting the Poughkeepsie Flight Service Station ("PFSS").[7] Within the space of two and one-half minutes, approximately eight inches of ice had already accumulated on the plane.

Swanson's first request to the New York Center was for a clearance to 3,000 feet. This request was denied because the Minimum Enroute Altitude ("MEA") along Swanson's route was 4,000 feet. Although this information is contained in various charts then in Swanson's possession, he testified he was unaware of it, for he would not have wasted precious time on a futile request. Having encountered freezing rain, a request for a higher altitude would have been the wiser move;[8] this alternative, however, was not practically available to Swanson once so much ice had accumulated. He knew from the earlier icing incident that he would be unable to climb above the freezing level.

Slightly more than a minute later, at 3:56:05 p. m., Swanson told the PFSS he could not maintain his altitude. Upon receiving this information from the PFSS, the New York Center asked Poughkeepsie to ascertain Swanson's intentions. Poughkeepsie did so and Swanson requested permission to reverse, which permission was granted immediately. Swanson's request, however, was not forthcoming until fifty seconds after the request for his intentions, approximately two minutes after the denial of a lower altitude, and approximately five minutes after his plane flew into freezing rain. In that Swanson was flying faster than the weather front was moving and he had been in clear weather before reaching the Cantrel intersection, Swanson could

effectively reduced this capability by almost one-half.

7. Swanson was unable to communicate directly with the New York Center. He contacted the PFSS, which in turn relayed his requests to the New York Center. Similarly, advice from the New York Center was transmitted to the PFSS, which then passed on the information to Swanson. The only contemporaneous record of the

sequence of events from this point until the crash is the tape recording of the dialogue between the New York Center and the PFSS.

8. Freezing rain occurs when rain falls from a warmer altitude and then freezes upon hitting a plane flying in a colder altitude. Since the temperature of the air ordinarily is lower at a higher altitude, freezing rain indicates the opposite of the norm, or, an inversion.

have prevented the massive accumulation of ice had he requested a "180" at the first indication of freezing rain.

Even after reversing course, the ice remained on the aircraft. Despite this, Swanson did not declare an emergency until 4:05:10 p. m., some thirteen minutes after he first encountered freezing rain. By this time, there was nothing the New York Center could do to save him. The ice forced the plane to lower and lower altitudes, communication with the PFSS became increasingly difficult, and contact was lost completely after 4:20 p. m. Swanson was attempting to reach Stewart Airport ("Stewart") when the plane crashed just west of Middletown, New York.

## DISCUSSION

■ Plaintiffs base their contention that the United States was negligent on two theories: (1) that the Harrisburg Flight Service Station personnel breached a duty owed to Swanson and Alsing by failing to give Swanson the entire and most current weather information available; and (2) that, during the "emergency" caused by the second icing encounter, the New York Center breached a duty owed to them by failing to suggest to Swanson that he land at Stewart Airport and/or aid Swanson in reaching it. Plaintiffs further assert that these breaches proximately caused the crash and the damages arising therefrom. Because the Court finds that Swanson was given all the weather information available to the HFSS personnel and that the New

York Center handled the emergency situation adequately, plaintiffs' claims are dismissed.[9]

### Duty to Provide Current Weather Information

■ It is undisputed that flight service station personnel have a duty to provide pilots with the most up-to-date weather information available. Plaintiffs claim that the HFSS personnel breached this duty by omitting several significant items of information from the two briefings and by omitting entirely the 1:40 p. m. forecast from the second briefing, which concluded at 1:55 p. m. These claims, however, are not supported by the evidence.

Swanson testified that his custom and practice in getting weather briefings was to request the weather and forecast of his destination and his route of flight if this information was not volunteered by the flight service specialist. He customarily asked for such things as altimeter settings, the dew point spread (a narrow spread would indicate the possibility of icing) and temperatures at various locations. Since this was a wintertime flight into New England, he would also inquire into the possibility of icing. Swanson testified he had no reason to believe he failed to follow his normal practice when he called the HFSS on the day in question.

Moreover, regarding the first briefing, Swanson conceded having no independent recollection of its contents. He recorded some of the information given, but these

9. At the end of trial plaintiffs argued for application of the rule enunciated in *Noseworthy v. City of New York*, 298 N.Y. 76, 80 N.E.2d 744 (1948). The New York Court of Appeals therein held that "in a death case a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence." 298 N.Y. at 80, 80 N.E.2d at 746. Although Swanson was very much alive when he testified at trial, it was argued that his loss of memory of the events preceding the crash, after the reversal of course, and his loss of consciousness for some forty days after the accident brings this case within the *Noseworthy* doctrine.

The Court disagrees. Swanson's testimony of the pertinent incidents on the day in ques-

tion was no more hazy or uncertain than that of any witness testifying about events occurring more than four years prior. Swanson concededly was unable to remember the contents of the first weather briefing, but so was Fitten. Swanson seemed to recall the two icing encounters as well as could be expected under the circumstances. The Court's attention has not been directed to any studies or expert opinions concerning the effect of loss of consciousness on the memory of preceding events and is unwilling to speculate on this issue. Moreover, application of the *Noseworthy* doctrine in other than death cases might be an incentive for the fogging of memories, an incentive the Court does not wish to promote.

notes were never recovered. Secondly, Swanson admitted that, although he did not cancel the trip after speaking with Fitten, he decided not to take off before obtaining further weather information. Having come from fair weather in South Carolina to worsening conditions as he approached Lancaster, Swanson was concerned about reaching Manchester before dark. Therefore, Swanson must have received enough information from the first briefing to caution him about the deteriorating weather farther north.

Swanson's assertion that he never received much of the information contained in Humphrey's statement is purportedly supported by notes allegedly made during the second briefing, which were retrieved after the crash. At first Swanson testified that he received only the information contained in his notes, but on cross-examination he admitted having received several significant items that do not appear therein. The reliability of these notes as an accurate barometer of the information Humphrey relayed to Swanson is further undermined by the fact that the notes contain an observation for Manchester, New Hampshire, a station that does not appear on the HFSS circuit.

In light of the above, the Court finds that Swanson received the weather information contained in the statements prepared by Fitten and Humphrey. The Court further finds that Humphrey did not breach a duty to plaintiffs by omitting the 1:40 p. m. forecast from the second weather briefing because that forecast information had not yet reached the HFSS when the briefing terminated.

Although plaintiffs' air traffic control expert, Robert Rudich, testified that the 1:40 p. m. forecast should have appeared on the teletype machine at Harrisburg before 1:55 p. m., evidence in the record establishes that the forecast did not appear on the teletype by this time.[10] The specific information at issue herein is the Boston forecast, usually the second area forecast transmitted to the HFSS. Preceding the area forecasts are pilot reports and certain other information. The length of time taken up by the various items of weather information depends upon the severity of the weather conditions. Because the conditions on January 28, 1973 were extreme, it is likely that the 1:40 Boston Area Forecast was not on the machine at 1:55 p. m.

Other evidence indicates that, had the 1:40 forecast been on the machine, Humphrey would have relayed it to Swanson. The teletype machine was only a few feet from the chair in which Humphrey was seated; he could see it without having to get up. Moreover, Humphrey testified he could hear the machine clicking when new information came in and therefore would have noticed the 1:40 forecast had it come on the machine sometime during the second briefing. Humphrey also stated that his custom and practice in briefing a pilot when new information is due is to notify the pilot that he is getting "old" weather and suggest that he call back for the more current information.

There is no record of precisely when the 1:40 Boston area forecast was transmitted to the HFSS. In light of the very real possibility that it was delayed past 1:55 p. m. and Humphrey's testimony that he surely would have noticed the forecast and relayed it to Swanson had it been on the machine, the Court finds that the 1:40 p. m. forecast was not available to Humphrey during the second weather briefing. Under these circumstance Humphrey cannot be said to have breached a duty by not giving Swanson the 1:40 p. m. Boston Area Forecast.[11]

---

10. This series of weather data is called the 1:40 p. m. forecast merely because the weather bureau prepared it at that time.

11. Even had Humphrey been in possession of the 1:40 p. m. forecast at the time of the second briefing, the Court would not find this breach of duty to have proximately caused the crash.

Humphrey's failure to give Swanson the 1:40 p. m. Boston Area Forecast was concededly irrelevant. Although this forecast indicated severe icing, whereas the earlier report forecasted only moderate icing, Swanson testified he would not have departed Lancaster had he received the information contained in Hum-

*Duty to Suggest Landing During an "Emergency"*

Plaintiffs' claims in this regard are somewhat inconsistent. On the one hand, plaintiffs' air traffic control expert testified that the New York Center's sole act of negligence was its failure to suggest to Swanson the possibility of landing at Stewart Airport. Swanson, however, testified that he requested a steer to Stewart and that the New York Center's negligence lay in its failure to respond to his request. If Swanson's testimony is to be believed, then he did not need the N.Y. ARTCC to suggest a landing at Stewart.

■ Even if Swanson's testimony in this regard is not credited, the Government's liability cannot be premised upon the New York Center's failure to suggest a landing at Stewart. An ARTCC has no duty to make this type of suggestion to a pilot. The Enroute Air Traffic Control Manual, which is promulgated by the Federal Aviation Administration, sets out the duties of controllers; it does not require the volunteering of suggestions, even during an emergency. The Manual directs controllers "to give the distressed planes priority to the extent consistent with the rules governing separation of aircraft[12] and to give the pilot any assistance which he requests. . . . No other duty is or should be imposed on controllers." *Deal v. United States,* 413 F.Supp. 630, 637 (W.D.Ark. 1976). Accordingly, the Court concludes that the New York Center was not under a duty to suggest to Swanson the possibility of landing at Stewart Airport.

■ Because the pilot has the foremost responsibility for the navigation and safety of the aircraft (except for separation), *see Spaulding v. United States,* 455 F.2d 222, 226–27 (9th Cir. 1972), an ATC faced with an emergency situation must first ascertain the pilot's intentions. Pursuant to that mandate, the New York Center asked the PFSS to find out Swanson's intentions after the Center was advised that Swanson was unable to maintain his altitude. The New York Center was entitled to expect Swanson, like any pilot, to know of the possibility of landing at any of the several airports in the vicinity and to have sufficient navigational information to enable him to make a reasoned decision. When Swanson relayed to the New York Center his intention to reverse course, the Center's sole duty was to aid Swanson by issuing the necessary clearance as expeditiously as possible. There is no dispute that the Center complied with Swanson's request in an adequate manner.

■ The claim that the New York Center was negligent in failing to direct Swanson to Stewart must also fall. Rudich testified that the controller could have given Swanson a 180° heading from the Walden intersection in order to enable him to intercept the localizer at Stewart Airport, but Swanson had already passed Walden at the time he reported the second icing encounter. Additionally, the Government's ATC expert stated that a controller who cleared a pilot for the route suggested by Rudich would be acting negligently because there would be no way to determine the precise position of the plane at the commencement of the heading. Swanson's contention that the New York Center could have given him a DF (direction finding) steer to Stewart, also must fall. That claim was based upon Swanson's mistaken impression that Stewart Airport had direction finding steer equipment. Nor could the N.Y. ARTCC have given him a radar vector to this airport. Stewart had neither DF steer equipment nor radar vectoring capabilities.

Because the Court has found that neither the HFSS personnel nor the New York Center controllers committed any acts of

phrey's statement. This was so because Swanson's Piper Cherokee 180 was prohibited from flight in any icing conditions. (Of course, Swanson argues he never received the earlier forecast.)

12. The primary duty of an ATC is to separate aircraft in the system in order to avoid collision.

negligence with respect to the crash on January 28, 1973, plaintiffs' complaint must be dismissed.

### Contributory Negligence

■ Assuming, *arguendo,* a breach of duty for which the Government was responsible did occur, plaintiff Swanson's manifest contributory negligence would act as a total bar to his recovery.

The record is laden with proof that Swanson was contributorily negligent. He departed Lancaster without remedying his radio malfunction and continued the flight even when forced to shut the radio off entirely. More significantly, Swanson failed to heed the danger of icing indicated in the weather information he admitted receiving and did not turn back after the first icing encounter. Defendant's expert in pilot operations testified that, based solely on Swanson's notes from the second briefing, a reasonably prudent pilot would not have made the flight. He further stated that even without any weather information, Swanson should have terminated the flight after the first icing incident.[13]

Swanson argues that federal comparative negligence law should apply in this case, but this position runs counter to the clear language of the Federal Tort Claims Act and is therefore rejected. The Act provides that the Government's liability is to be determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). This phrase has been interpreted to mean that the law of the *state* where the allegedly wrongful acts occurred is determinative of the Government's liability. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The case primarily relied upon by plaintiffs, *Kohr v. Allegheny Airlines, Inc.,* 504 F.2d 400 (7th Cir. 1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975), involved claims against private parties and, for that reason, is plainly inapposite.

■ At the time of the crash it was the law of both Pennsylvania and New York, the only states where the allegedly negligent acts occurred, that a plaintiff's contributory negligence would completely bar his recovery. *See, e. g., McCay v. Philadelphia Elec. Co.,* 447 Pa. 490 (1972), 291 A.2d 759; *Binder v. Supermarkets Gen. Corp.,* 49 App.Div.2d 562, 370 N.Y.S.2d 184 (2d Dep't 1975). Consequently, even if either the HFSS personnel or the New York Center breached a duty owing to the plaintiffs, the United States would not be liable to plaintiff Swanson due to his contributory negligence.[14]

For these reasons, judgment is hereby granted in favor of the defendant and the complaint is dismissed.

The foregoing constitute the findings of fact and conclusions of law of the Court in accordance with Fed.R.Civ.P. 52(a).

SO ORDERED.

---

**13.** It is therefore unnecessary to decide the admissibility of evidence indicating that Swanson violated various Federal Aviation Regulations during the flight.

**14.** In an attempt to overcome the contributory negligence barrier, Swanson argues for application of the "last clear chance" doctrine. This rule "means that a defendant who find [sic] himself confronted with a dangerous situation created by the plaintiff's negligence must use such care as is open to him to avoid injuring the plaintiff; and it presupposes that he acquired knowledge of the danger in time to have avoided the accident by the exercise of reasonable care." *Mulberg v. Mason & Dixon Lines, Inc.,* 157 F.2d 805, 806 (2d Cir. 1946).

After encountering ice at the Cantrel intersection, Swanson did not contact the N.Y. ARTCC until after eight inches of ice already had accumulated on the aircraft. Even were the Court to impose a duty on the controller to suggest a landing at Stewart Airport when he had enough information to deem the situation an "emergency," there is no proof that at this point in the crisis Swanson could have safely executed such a landing. In fact, the evidence tends to establish that navigation to Stewart would have been difficult and dangerous. Accordingly, the doctrine of the "last clear chance" is inapplicable to the facts of this case.