**Pearl DAVIS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 81 C 3941.**

United States District Court, N.D. Illinois, E.D.

Jan. 17, 1986.

Robert C. Moore, Susan E. Loggans & Associates, Chicago, Ill., for plaintiff.

J. Paul McGrath, Asst. U.S. Atty., David V. Hutchinson, Trial Atty., Civ. Div. Torts Branch, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF FINDINGS AND CONCLUSIONS

LEIGHTON, District Judge.

### I. *Introduction*

This is a civil action brought against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Plaintiff, Pearl Davis, sues in her capacity as executrix of the estate of her deceased husband, Raymond E. Davis. She alleges that the actions and conduct of an agent of the United States in providing a weather briefing to Davis on the morning of October 25, 1978, constituted negligence that proximately caused his death in the crash of a private airplane during the early morning hours of that day.

The case was tried to the court; evidence was presented, consisting of the testimony of witnesses, including three by deposition, and exhibits received into the record. On April 16, 1985, this court orally announced its findings of fact and conclusions of law and entered judgment in favor of defendant and against plaintiff; Memorandum of Findings and Conclusions to be issued at a later date. On April 26, 1985, plaintiff, pursuant to Fed.R.Civ.P. 52(b), moved for entry of an order amending the court's oral findings of fact and conclusions of law. The parties submitted memoranda on that motion; after reviewing the submissions of the parties and the trial record, the court, in accordance with its April 16, 1985 order, makes the following written findings of fact and reaches the following conclusions of law.

### II. *Findings of Fact*

1. Raymond E. Davis ("Davis") was co-owner, along with three other persons, of a Comanche airplane, Piper model PA 24–260, registered as number N–8666P. On the morning of October 25, 1978, the aircraft was at an uncontrolled airport in Dixon, Illinois.[1]

2. Two sets of FAA rules govern the operation of aircraft by pilots. Visual Flight Rules apply to flights in which the pilot is guided by what he or she can see in the area around the aircraft and on the ground below. Instrument Flight Rules govern flight in which the pilot is guided by the aircraft's instruments. The FAA

---

1. An uncontrolled airport is one at which there are no Federal Aviation Administration ("FAA") personnel.

rules and regulations for both types of flight are found primarily in chapter 14 of the Code of Federal Regulations, part 91, subpart B.

3. On October 25, 1978, Davis was certified to pilot a private airplane under Visual Flight Rules ("VFRs").[2] Davis had taken and failed his flight test on March 9, 1978. He was retested and issued a private pilot's license on March 10, 1978. His flight test was conducted in a Cessna 172 aircraft, an aircraft that is considerably less sophsticated than the Piper PA 24–260 Comanche. Prior to October 25, 1978, Davis had logged approximately 195.5 hours of total flight time, about 35 of which were in a Comanche aircraft. Davis had also completed approximately 5.5 hours of simulated flight practice. His last simulated flight practice had been on March 7, 1978.

4. Davis was not certified, nor qualified, to operate an airplane under Instrument Flight Rules ("IFRs"). His log showed no IFRs flight time in the Piper aircraft. It would have been a violation of the law for Davis to fly IFRs.

5. VFRs regulate the meterological conditions in which VFRs-certified pilots are permitted to operate an aircraft. Unlike IFRs which allow an IFRs-certified pilot greater latitude with regard to the altitude and the kind of weather in which the pilot may fly, IFRs place limits on flight by VFRs-certified pilots. One such limit is that a VFRs-certified pilot may not place his or her airplane among clouds that restrict the pilot's view of the area surrounding the aircraft or of the ground.

6. In order to undertake VFRs flight, FAA regulations require a cloud ceiling 1000 feet or more above the earth's surface and a flight visibility of at least three miles. 14 C.F.R. § 91.105. According to 14 C.F.R. § 1.1, " 'Ceiling' means the height above the earth's surface of the lowest layer of clouds or obscuring phenomena that is reported as "broken", 'overcast', or 'obscuration', and not classified as 'thin' or 'partial' ... 'Flight visibility'

means the average forward horizontal distance, from the cockpit of an aircraft in flight, at which prominent lighted objects may be seen and identified by night." Thus, VFRs flight conditions may exist even if there is rain in the area as long as the cloud ceiling producing the rain is not below 1000 feet and the pilot can see a prominent unlighted object three miles away in daylight or a prominent lighted object three miles away at night. VFRs are also possible even though there are clouds below 1000 feet as long as they are "thin" or "partial." The weather services use the word "scattered" to describe a partial layer of clouds.

7. The FAA regulations also require that a VFRs pilot keep his or her aircraft at least 500 feet under, 1000 feet over and 2000 feet horizontally from any clouds. A primary purpose of the VFRs is to insure that VFRs pilots have sufficient outside visual references to enable them to maintain control over their aircraft.

8. A pilot who is certified to operate an aircraft under IFRs may fly an appropriately equipped airplane safely into clouds. The IFRs pilot is guided by reference to the aircraft's instruments rather than by what he or she can see outside of the aircraft. FAA regulations require special training and passage of written and flight examinations before a pilot may be certified for IFRs flight. *See* 14 C.F.R. § 61.65.

9. The FAA maintains flight service stations at various points throughout the United States. One such facility is located in Rockford, Illinois. The Rockford flight service station, like its counterparts elsewhere in the nation, is staffed by FAA personnel who are employees of the defendant United States of America.

10. FAA flight service stations provide pilots with a wide range of services. One service is furnishing pilots, who request weather information, with weather summaries based on data provided to the flight service station by the National Weather

---

2. VFRs certification permits a pilot to proceed by the route and altitude of his own choosing, controlling his aircraft primarily by the "see and avoid" method of airplane operation.

Service. Pilots visit the flight service station in person or contact the station by radio or telephone to request these weather summaries called "weather briefings." It is routine procedure for pilots to contact facilities such as the Rockford flight service station for a weather briefing before undertaking a flight.

11. There are different types of employees at a flight service station. One type of employee is the weather briefer who provides weather data to pilots upon request. Weather briefers do not forecast weather, their job is merely to make available to those who call upon, or communicate with, the facility, the weather data which has been provided by the National Weather Service prior to the time of the briefing.

12. Weather briefers are limited in what they may tell a pilot. They may not tell a pilot not to fly his or her airplane. The pilot makes that decision based upon the weather information provided to him or her by the weather briefer or other source. Pilots have a right to rely on what they are told by the weather briefers as correct and on the weather briefer providing all the pertinent weather data available at the facility at the time of briefing. The final decision of whether the pilot will undertake the proposed flight is left to the pilot. This is because the pilot is the owner or possessor of the aircraft, knows the flight route, knows the equipment and the aircraft, and it is fair to assume, has some experience with the aircraft and knows his or her own capabilities.

13. Regarding the duties of weather briefers, the FAA Handbook, Flight Services 7110.10D, which was in effect and controlled the actions of weather briefers on October 25, 1978, states:

166. REQUESTING WSO/WSFO ASSISTANCE

Do not issue weather forecasts, warnings, or advisories unless issued by an NWS office. When a forecast is inaccurate, request assistance from the appropriate WSO or WSFO....

168. CONDUCT OF PREFLIGHT BRIEFING

a. The object of a preflight briefing is to communicate to a pilot meterological and aeronautical information necessary for the conduct of a safe and efficient flight. Do not brief by reading weather reports and forecasts verbatim unless specifically requested by the pilot. Obtain the following information prior to conducting a briefing when it is not already known:

(1) Type of flight planned, e.g., VFR or IFR.

(2) Aircraft number or pilot's name.

(3) Aircraft type.

(4) Departure airport.

(5) Route-of-flight.

(6) Destination

(7) Flight altitude(s).

(8) ETD and ETE.

(b) Using all available weather and aeronautical information, provide the following data in the following sequence when it is applicable to the proposed flight:

Note: Specifically emphasize reports of temperature inversions, low level wind shear, thunderstorms, and/or frontal zones within 50 NM of the departure and arrival terminals....

(2) VFR Flight Not Recommended (VNR)—When VFR flight is proposed and the actual or forecast conditions, surface based or aloft, are such as to make visual flight (VFR) doubtful, advise the pilot by describing the condition(s) followed by the phrase "V-F-R flight not recommended."

(8) Winds Aloft—Interpolate winds and temperatures between levels and stations as necessary.

14. Sometime in the afternoon of October 25, 1978, Davis was to have a business meeting in Decatur, Illinois. In contemplation of a flight from Dixon, Illinois to Decatur, Illinois, Davis telephoned the Rockford flight service station at approximately 5:51 a.m. to obtain a weather briefing. Robert D. Knize ("Knize") was on duty at the Rockford flight service station between midnight and 8:00 a.m. on October 25, 1978.

Knize is an air traffic control specialist, flight service station option. His duties include providing weather briefings to pilots. At approximately 5:51 a.m. on October 25, 1978, Knize received a telephone call from a man who identified himself as the pilot of N–8666P. The call lasted three to four minutes. The court finds that the caller was Davis.

15. During the course of his telephone conversation with Knize, Davis requested a weather briefing for a flight under Visual Flight Rules. Davis requested a VFRs briefing and indicated that he needed to be told of weather conditions pertaining to VFRs flight from the place of take-off to the place of destination. Although the conversation was not recorded, there is no serious dispute as to most of what transpired. Knize requested and obtained information about the flight Davis planned to undertake, including where he planned to depart from, where he was going, and when he planned to return. Davis told Knize that he planned a flight from Dixon, Illinois to Decatur, Illinois, and that he would return later that same day.

16. Weather data is received at facilities such as the Rockford flight service station only during certain times of the day and during certain periods of the hour. The routine and times when weather data is received at such facilities is well known by both the personnel of the facilities and by persons who use their services, such as pilots. As a result of his training and experience, Davis knew the availability of weather data to the Rockford flight service station. Specifically, Davis knew what data was generally available to the facility, when it was received, the time during the hour when supplementary data and updates were received and matters of a similar nature.

17. A flight service station generally received the following weather information from the National Weather Service via teletype: Area Forecasts, Terminal Forecasts, Observation Reports (sometimes called Surface Reports or Sequences), Winds Aloft, SIGMETS and AIRMETS. A flight service station also receives graphic weather data from the National Weather Service over a facsimilie circuit. Typical graphic data received includes: 700 and 500 Millibar (lines of equal pressure) Charts, Low-Level Significant Weather and Surface Prognostic Charts, Surface Analysis Charts and Radar Summaries.

18. At the time he took the call from Davis, Knize had available to him a set of National Weather Service Area Forecasts that had been issued by the Chicago Forecast Office at 7:00 p.m. on October 24, 1978. The forecasts were valid for the period from 8:00 p.m. on October 24, 1978 to 2:00 p.m. on October 25, 1978. The reports, in pertinent part, read as follows:

Minnesota, Iowa, Missouri, Wisconsin, Illinois, Michigan, Indiana, Kentucky, Lake Michigan, United States portions Lakes Superior and Huron.

Heights above sea level unless noted. Synopsis. Low north-central border Minnesota with cold front trailing southward and high pressure ridging to Texas. Low will move northeastward with cold front swinging to eastern tip Lake Superior across northwestern Illinois to west-central Missouri as ridge weakens and drifts southeastward by 1400 Thursday. Significant clouds and weather. Northwestern two-thirds Missouri, southeastern two-thirds Iowa, northwestern two-thirds Illinois, southern and eastern Wisconsin, Upper Michigan, eastern two-thirds Lake Superior, Upper Michigan [sic], Lake Michigan. No significant clouds and weather. Becoming 0300–0900 ceilings 7,000–9,000 feet broken, top 12,000 feet with scattered light rain showers. Becoming 0700–1100 conditions 2,000–4,000 feet scattered to broken, ceiling 8,000–10,000 feet broken to overcast, top 14,000 feet, with scattered light rain showers and few thunderstorms and moderate rain showers Missouri. Cumulonimubus tops 35,000 feet. Icing. Occasional moderate rime or mixed icing in clouds above and possible severe in cumulonimbus above freezing level. Freezing level 3,000 feet north-

western Minnesota sloping to 12,000 feet southern Missouri to Kentucky.

19. The Chicago Forecast Office of the National Weather Service issued an in-flight weather advisory (AIRMET) at 2:20 a.m. on October 25, 1978, which Knize had available to him at the time of the Davis weather briefing. The advisory, which was valid for the period between 2:20 a.m. and 8:20 a.m. on that day, read as follows:

AIRMET Delta 2. Flight Precaution. Missouri, Iowa, southeastern two-thirds Minnesota, Wisconsin, Illinois, Michigan, northern Indiana, and Lakes Superior, Michigan, and Huron for strong low-level winds and turbulence. Winds at or above 30 knots within 2,000 feet of sur-face and occasional moderate turbulence below 4,000 feet. Continue advisory be-yond 0820.

20. Knize also had available to him at the time of the Davis weather briefing Ter-minal Forecasts for Rockford and Decatur, Davis' take-off and destination points. The Decatur forecast was issued at 4:43 a.m. on October 25, 1978, and was valid for the 24–hour period beginning at 5:00 a.m. on that day. The Decatur forecast read in pertinent part:

005–1200, ceiling 11,000 feet broken, wind 190° 14 knots.

The Rockford forecast was issued at 4:40 a.m. on the day in question and was valid at the time of the Davis weather briefing. It was the most recent forecast then avail-able.

21. Finally, Knize had available to him, at the time of the Davis weather briefing, Observation Reports for Rockford, Du-Page, Peoria and Decatur. These stations cover the point of take-off, destination and the entire flight route. Knize also had available to him Observation Reports for Moline. All Observation Reports then available to Knize had been received prior to 5:51 a.m. on October 25, 1978. The Observation Reports (for the times and ar-eas indicated) read in pertinent part:

*Rockford*

0455, measured ceiling 5,500 feet broken, 10,000 feet overcast, visibility 12 miles, temperature 49 degrees Fahrenheit, dew point 41 degrees Fahrenheit, wind 180 degrees 12 knots, altimeter setting 29.60 inches.

0548, local observation, 2,100 feet scat-tered, measured ceiling 3,600 feet bro-ken, 5,500 feet overcast, visibility 12 miles, light rain showers, wind 190 de-grees 11 knots, altimeter setting 29.61 inches.

*DuPage*

0450, ceiling estimated 9,000 feet broken, visibility 10 miles, temperature 48 de-grees Fahrenheit, dew point missing, wind 190 degrees 12 knots, altimeter set-ting 29.65 inches.

*Peoria*

0455, ceiling measured 6,000 feet broken, 25,000 feet overcast, visibility 10 miles, light rain showers, temperature 49 de-grees Fahrenheit, dew point 43 degrees Fahrenheit, wind 170 degrees 12 knots, altimeter setting 29.67 inches, rain began at 0413.

*Decatur*

0451, ceiling estimated 9,000 feet over-cast, visibility 10 miles, light rain, temp-erature 51 degrees Fahrenheit, dew point 38 degrees Fahrenheit, wind 200 degrees 19 knots, gusts 24 knots, altimeter set-ting 29.75 inches, rain began at 0451.

*Moline*

0454, ceiling measured 2,200 feet broken, 5,000 feet overcast, visibility 5 miles, light rain, fog, temperature 51 degrees Fahrenheit, dew point 46 degrees Fahr-enheit, wind 200 degrees 10 knots, altim-eter setting 29.59 inches, ceiling ragged, rain began at 0411.

22. The National Weather Service Area Forecasts; in-flight advisory (AIRMET); Rockford and Decatur Terminal Forecasts; and Observation Reports for Rockford, Du-Page, Peoria and Decatur received at the flight service station prior to 5:51 a.m. were the only pertinent materials available to Knize at the time he provided the weath-er briefing to Davis on October 25, 1978.

23. At 7:00 a.m. on October 25, 1978, after the weather briefing, the National

Weather Service issued a weather analysis that showed a cold front which extended southwestward from Canada to northwestern Wisconsin, north-central Iowa and the Texas panhandle. It also showed a low pressure system that was centered over the southwestern Kansas area and a trough that extended from northern Missouri south-southwestward to the Texas-Mexico border.

24. The following Observation Reports disclose the pattern of developing weather around the time of, and after, the 5:51 a.m. weather briefing along the flight route and in the Moline area. These observations were not available to Knize at the time of the Davis weather briefing.

*Rockford*

0556, record special observation, measured ceiling 2,000 feet broken, 3,600 feet overcast, visibility 3 miles, light rain showers, temperature 52 degrees Fahrenheit, dew point 45 degrees Fahrenheit, wind 190 degrees 9 knots, altimeter setting 29.61 inches, rain began at 0545.

0657, measured ceiling 1,000 feet broken, 2,000 feet overcast, visibility 3 miles, light rain showers, temperature 50 degrees Fahrenheit, dew point 47 degrees Fahrenheit, wind 200 degrees 12 knots, altimeter setting 29.61 inches.

0711, special observation, measured ceiling 700 feet overcast, visibility 3 miles, light rain showers, wind 200 degrees 11 knots, altimeter setting 29.60 inches.

0720, special observation, measured ceiling 600 feet overcast, visibility 3 miles, light rain, fog, temperature 50 degrees Fahrenheit, dew point 48 degrees Fahrenheit, wind 200 degrees 11 knots, altimeter setting 29.60 inches, aircraft mishap.

The record of surface weather observations for Rockford showed that fog began at 0720.

*DuPage*

0550, ceiling estimated 7,000 feet broken, 10,000 feet overcast, visibility 10 miles, temperature 49 degrees Fahrenheit, dew point missing, wind 190 degrees 12 knots, altimeter setting 29.64 inches.

0650, ceiling estimated 5,000 feet broken, 10,000 feet overcast, visibility 5 miles, light rain, temperature 47 degrees Fahrenheit, dew point missing, wind 190 degrees 10 knots, gusts 14 knots, altimeter setting 29.62 inches, rain began at 0620, pilot report—over Aurora at 0645, flight altitude 4,000 feet, Piper PA–32, light chop below clouds, flight visibility 3–4 miles, light rain showers, on instruments at 4,000 feet with moderate rain showers, occasional light rain showers.

0710, special observation, ceiling measured 1,900 feet broken, 7,000 feet overcast, visibility 2 miles, moderate rain, wind 200 degrees 10 knots, gusts 13 knots, altimeter setting 29.62 inches, surface visibility 3 miles.

0715, special observation, ceiling measured 800 feet overcast, visibility ¾ mile, moderate rain, fog, wind 200 degrees 10 knots, gusts 13 knots, altimeter setting 29.62 inches.

*Peoria*

0558, ceiling measured 6,000 feet overcast, visibility 12 miles, temperature 50 degrees Fahrenheit, dew point 44 degrees Fahrenheit, wind 180 degrees 11 knots, altimeter setting 29.67 inches, rain ended at 0520.

0658, ceiling measured 3,000 feet overcast, visibility 4 miles, light rain showers, temperature 49 degrees Fahrenheit, dew point 46 degrees Fahrenheit, wind 180 degrees 9 knots, altimeter setting 29.67 inches, radiosonde data—freezing level 12,100 feet mean sea level (m.s.l.), relative humidity at the freezing level was 100 percent.

0711, special observation, ceiling measured 2,300 feet overcast, visibility 2 miles, light rain showers, fog, wind 180 degrees 10 knots, altimeter setting 29.67 inches.

*Decatur*

0548, ceiling estimated 9,000 feet overcast, visibility 8 miles, temperature 51 degrees Fahrenheit, dew point 38 degrees Fahrenheit, wind 200 degrees 16 knots, gusts 23 knots, altimeter setting 29.75 inches, rain ended at 0505.

0650, 3,500 feet scattered, ceiling estimated 8,000 feet overcast, visibility 10 miles, temperature 52 degrees Fahrenheit, dew point 39 degrees Fahrenheit, wind 210 degrees 17 knots, gusts 24 knots, altimeter setting 29.74 inches.

0752, 4,000 feet scattered, ceiling estimated 8,000 feet broken, 12,000 feet overcast, visibility 10 miles, temperature 53 degrees Fahrenheit, dew point 40 degrees Fahrenheit, wind 210 degrees 16 knots, gusts 24 knots, altimeter setting 29.73 inches.

*Moline*

0527, special observation, 800 feet scattered, ceiling measured 1,500 feet overcast, visibility 4 miles, light rain, fog, wind 210 degrees 10 knots, altimeter setting 29.60 inches, ceiling ragged.

0554, 800 feet scattered, ceiling measured 2,000 feet broken, 5,000 feet overcast, visibility 5 miles, light rain, fog, temperature 51 degrees Fahrenheit, dew point 46 degrees Fahrenheit, altimeter setting 29.59 inches, ceiling ragged.

0654, record special observation, 700 feet scattered, ceiling measured 900 feet broken, 2,000 feet overcast, visibility 4 miles, light rain, fog, temperature 54 degrees Fahrenheit, dew point 50 degrees Fahrenheit, wind 200 degrees 14 knots, gusts 21 knots, altimeter setting 29.58 inches, ceiling ragged, peak wind 200 degrees 26 knots at 0642.

0715, special observation, 600 feet scattered, ceiling measured 2,000 feet overcast, visibility 2½ miles, light rain, fog, wind 210 degrees 15 knots, altimeter setting 29.58 inches, ceiling ragged.

25. Knize briefed Davis on weather conditions between Davis' anticipated point of departure in Dixon, Illinois, and point of arrival in Decatur, Illinois. This included weather information covering Rockford, DuPage, Peoria and Decatur, the entire route of the proposed flight. In addition, Knize provided Davis with the then available Observation Reports for Moline. The briefing was for a flight under VFRs. Knize informed Davis that the forecasts for that morning indicated a low pressure system centered in south-central Missouri with a cold front cutting across the southern part of Indiana. Knize explained to Davis that the cold front would bring rain showers and generally deteriorating conditions along the flight route. Further, Knize advised Davis that there were rain showers throughout most of northern Illinois at the time of the briefing. Moreover, Knize provided Davis with the Area Forecasts, the National Weather Service inflight advisory (AIRMET), the Rockford and Decatur Terminal Forecasts, and the then available Observation Reports for the areas along the flight route and for Moline.

26. Davis placed the telephone call requesting a weather briefing from his home in Oregon, Illinois. During the course of their conversation, Davis informed Knize that he would be leaving for the Dixon airport within a short time after their conversation. Davis left his home at approximately 6:10 a.m. and drove the twelve miles to the Dixon airport. He arrived at the airport around 6:40 a.m. Upon his arrival, Davis proceeded to one of the hangars to prepare N–8666P for flight. He took off in N–8666P from runway 8 of the Dixon airport at approximately 7:05 a.m. Davis was the pilot and sole occupant of the airplane. The aircraft crashed at 7:12 a.m. in Ashton, Illinois, ten miles east of the Dixon airport. Davis was killed in the crash and his body was found at the crash site.

27. It was raining at the Dixon airport at the time Davis took off in N–8666P on the morning of October 25, 1978. Investigation after the crash revealed that the windshield wipers on the automobile owned by Davis and parked at the Dixon airport were in the "up" position, indicating that for some distance prior to arriving at the Dixon airport there was sufficient rain to compel the vehicle's driver to use the wipers. It is reasonable to infer that Davis was the driver of the vehicle and that he used it to drive to the Dixon airport from his home in Oregon, Illinois, on the morning in question. Thus, Davis himself was aware of the rain. The rain was not only known to Davis, but it was consistent with

the weather briefing he had been given by Knize. Knize had told Davis that a cold front would bring rain showers and generally deteriorating conditions to the area and that there were rain showers present throughout most of northern Illinois.

28. A pilot of Davis' experience is not oblivious to the ordinary aspects of the weather that can be visually perceived. The court makes this finding despite the testimony, of those who claim to be experts, that it is not always possible to judge from the ground the altitude of observable weather conditions. To the contrary, when rain is falling, it is observable. Moreover, whether a pilot can judge the exact altitude of weather conditions from the ground, this court finds that a pilot who is about to venture into the atmosphere in an aircraft that will travel at speeds of up to 200 miles per hour will be acting with some degree of apprehensiveness about the weather conditions around him or her.

29. Dorothy K. Wussow ("Wussow") and her husband live at the Dixon airport. Mr. Wussow is the fixed base operator of the airport. At approximately 7:00 a.m. on October 25, 1978, Mrs. Wussow was walking across the airport to the terminal in order to open the airport offices. As she opened the office door, Wussow saw the reflection of the red rotating beacon of an aircraft near the T-hangars. The aircraft was N-8666P. Wussow is a certified weather observer and she was able to observe the weather conditions at the Dixon airport at 7:00 a.m. on October 25, 1978. Wussow described the weather conditions as follows:

Weather—Approx 500′ overcast, raining, visibility ¾ to 1 mile, at 7:00 a.m. on October 25, 1978 at Dixon airport, Dixon, Illinois.

Wussow was also able to provide the following observations:

I heard the airplane engine, saw rotating beacons reflecting on south end of T hangars, but did not see aircraft take off. About 7:20 a.m. I heard an aircraft call Sterling UNICOM and report SQI (Sterling, Illinois) had an overcast at 600′ and another layer at 1100′.

30. Davis did not seek or receive additional weather information after the 5:51 a.m. weather briefing and before he took off in N-8666P on the morning of October 25, 1978. Davis did not ask Wussow for a weather observation though she would have provided one if requested. Davis also did not telephone the Rockford flight service station for an updated weather briefing despite a telephone being available to him at the Dixon airport. As a convenience to pilots, the north door to the Dixon airport terminal is open at all times and a public telephone is located inside the terminal.

31. After Davis took off in N-8666P, the aircraft penetrated the cloud ceiling. Kenneth Garner ("Garner") had just parked his truck in Ashton, Illinois, when he heard the sound of an airplane putting on power. Garner turned in the direction of the sound and observed N-8666P coming out of the overcast, flying in an erratic manner and at a high rate of speed. Something then separated from the aircraft and fell to the ground. This observation supports Garner's testimony that the aircraft was traveling at a high rate of speed as there was evidence that an aircraft of the type in question could not be operated at speeds in excess of 200 miles per hour without endangering it structurally.

32. At the time Garner observed N-8666P, the aircraft was flying level, its wings parallel to the ground at an altitude of 150 to 200 feet. After Garner observed something separate from the aircraft and fall to the ground, he saw N-8666P nose over and crash.

33. At the time of the crash, scattered rain showers were being reported at various points along the cold front that was in the area. However, no rain was falling at the crash site. The weather conditions at the crash site, as observed by Garner, were foggy and overcast. No thunderstorms were reported in the area of the flight route at any time.

### III. Conclusions at Law [3]

1. The court has jurisdiction over the parties and subject matter of this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). In an action brought under the Federal Tort Claims Act, the law of the state in which the action arose is applied to the plaintiff's claim. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). As this action arose in Illinois, the substantive tort law of Illinois applies.

2. Illinois tort law applies a pure form of comparative negligence. Under Illinois law a plaintiff's damages are reduced by the percentage of fault attributable to him or her. *Alvis v. Ribar*, 85 Ill.2d 1, 25–28, 52 Ill.Dec. 23, 33–35, 421 N.E.2d 886, 896–98 (1981). The adoption of comparative negligence does not change the burden the plaintiff must meet in order to recover on his or her claim. The plaintiff must prove each element of his or her case by a preponderance of the evidence.

3. The plaintiff must show that defendant owed a duty to plaintiff's decedent, that the defendant was negligent, and that the defendant's negligence was the proximate cause of the decedent's death. *Bernardoni v. Hebel*, 101 Ill.App.3d 172, 174, 56 Ill.Dec. 742, 743, 427 N.E.2d 1288, 1289 (1981). Thus, in the present case the plaintiff must establish by a preponderance of the evidence that Robert D. Knize, the FAA weather briefer, owed a duty of care to the plaintiff's decedent, Raymond E. Davis; that Knize failed to discharge that duty on the occasion in question and, thus, was negligent; and that Knize's negligence was a proximate cause of Davis' death. Neither an accident occurring, nor Davis' having an accident after being briefed by Knize, satisfies plaintiff's burden of proving negligence or raise a presumption of negligence on the part of Knize. *Moss v. Wagner*, 27 Ill.2d 551, 555, 190 N.E.2d 305, 307 (1963); *Burgdorff v. International Business Machines Corp.*, 74 Ill.App.3d

158, 163, 29 Ill.Dec. 626, 629, 392 N.E.2d 183, 186 (1979).

4. Applying these rules of law to the present case, this court concludes that the plaintiff has failed to show that Knize was negligent in the manner in which he conducted the weather briefing in question. Knize provided Davis with all the pertinent weather information available at the flight service station at the time in question. Knize told Davis, to the best of his ability at the time, the weather Davis could expect on a flight from Dixon, Illinois to Decatur, Illinois.

5. Plaintiff alleges that weather briefer Knize was negligent in failing to advise Davis that a VFRs flight was not recommended as required by the FAA Flight Services Handbook. A review of the evidence demonstrates, however, that at the time of the weather briefing, the weather data available to Knize indicated VFRs weather along the entire flight route. Thus, not only was Knize not negligent in failing to make a statement that VFRs flight was recommended, it would have been error for him to do so.

6. Plaintiff next asserts that Knize was negligent in failing to hold Davis on the telephone or in failing to arrange for a callback so as to include hourly Observation Reports for the upcoming hour in the weather briefing. This information was not available to Knize at the time of the briefing, but Knize expected to receive it and did receive it a short time after the briefing. Weather briefers only have a duty to provide pilots with the weather information available to the briefer at the time of the briefing. *Cf., Swanson v. United States*, 435 F.Supp. 654, 660 (S.D.N.Y.1977). Furthermore, this court has found that Davis, as an experienced pilot, knew or should have known that Observation Reports are taken approximately on the hour. This is stated in the Airman's Information Manual. Knize was not re-

---

**3.** As predicates of certain of the conclusions of law which the court reaches, findings of fact particularly pertinent and relevant, will be made. For literary convenience and clarity, they will be included in this part of the Memorandum.

quired to remind Davis of what every pilot should know, and he was not negligent for failing to do so.

7. Plaintiff also alleges that at the time of the weather briefing there were inconsistencies between the forecasts available to Knize and the actual surface observations (Observation Reports) Knize had before him. Plaintiff asserts Knize was negligent in failing to either contact the National Weather Service for further information or advise Davis of the inconsistencies. The court is aware that the FAA Flight Services Handbook requires a weather briefer to request assistance from a Weather Service Office when a forecast is inaccurate. However, the discrepancies involved were not sufficient to warrant such action by Knize. The differences between the Chicago area forecast and Rockford terminal forecast, on the one hand, and the 0548 Rockford surface observation and 0454 Moline surface observation, on the other hand, merely indicated that the deteriorating conditions expected in the area had arrived earlier than expected. They did not indicate a drastic change from the forecast nor did they indicate that conditions would rapidly deteriorate.

8. Moreover, the greater inconsistency was between the forecasts and the Moline surface observation. As previously noted, Moline was not one of the areas along the flight route. Under these circumstances Knize was not negligent in failing to seek assistance from the National Weather Service. Knize also was not negligent in failing to point out the discrepancies between the forecasts and surface observations to Davis. Davis was given both the forecasts and the surface observations as part of the weather briefing. Knize could reasonably conclude that Davis, an experienced pilot, would recognize the discrepancies himself. Again, a weather briefer need not point out what every pilot should know.

9. Moreover, the weather briefing provided by Knize to Davis was not a proximate cause of the crash of N–8666P and Davis' death. This is not to say that the weather itself was not a proximate cause of the crash, a finding this court neither makes nor rejects, only that the weather briefing was not a proximate cause of the crash. An act of omission is a proximate cause of an injury if the injury follows as a natural and probable result of the act or omission and an ordinarily prudent person ought to have foreseen the injury as a likely result of the act or omission. *Carr v. Shirland Township*, 66 Ill.App.3d 1033, 1036, 23 Ill.Dec. 655, 658, 384 N.E.2d 449, 452 (1978). If the injury is the result of an unforeseeable series of events, there is no chain of proximate causation between the act or omission and the injury. Knize could not be expected to foresee that Davis would ignore information in the weather briefing that conditions were deteriorating and the visible indicia of deteriorating conditions at the Dixon airport on the morning of October 25, 1978 and undertake an unwise flight.

10. Weather briefers are under no duty to foresee the unlawful or negligent acts of pilots. *Baker v. United States*, 417 F.Supp. 471, 486 (W.D.Wash.1975). It was the acts of Davis, not the weather briefing provided by Knize, that proximately caused the crash of N–8666P and Davis' death. The burden was on Davis, not Knize, to assure that Davis had the most recent weather information available from Rockford flight service station or other weather source before undertaking the proposed flight.

11. Federal Aviation Rules ("FARs") have the force of law. *Tilley v. United States*, 375 F.2d 678, 680 (4th Cir. 1967); *Sawyer v. United States*, 297 F.Supp. 324, 332 (E.D.N.Y.1969), *aff'd* 436 F.2d 640 (2d Cir.1971). The violation of an FAR by a pilot constitutes negligence as a matter of law. *Cf., Manning v. M/V "Sear Road"*, 417 F.2d 603, 608 (5th Cir. 1969); *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443, 446 (3d Cir.1969); *United States v. Miller*, 303 F.2d 703, 711 (9th Cir.1962). Under the FARs, the pilot in command is directly responsible for and has final authority over, the operation of an aircraft. 14 C.F.R. § 91.3; *see, also,*

*Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972); *Deal v. United States*, 413 F.Supp. 630, 637 (W.D.Ark.1976). One aspect of that responsibility is making an informed decision that weather conditions are suitable for the proposed flight. *Cf., De vere v. True Flite*, 268 F.Supp. 226, 228 (E.D.N.C.1967).

12. Although it might not have been necessary under other circumstances for Davis to assure himself that VFRs flight was still possible when he arrived at the Dixon airport on the morning of October 25, 1978, it was seriously imprudent of Davis to fail to make further inquiry in light of the admonition he had been given by Knize that deteriorating weather conditions were expected and in light of the observable weather conditions then prevailing. As a pilot, Davis could not "ignore the weather information he [had] been given or disregard the weather conditions he [saw] around him." *Spaulding v. United States*, 455 F.2d at 227. Moreover, Davis could not rely on the information he had received in the weather briefing an hour earlier to "absolve him from the affirmative duty of seeking information that was readily available." *Black v. United States*, 441 F.2d 741, 744 (5th Cir.1971).

13. Not only did Davis have a duty to assure himself that the weather conditions were sufficient to permit VFRs flight, he also had the opportunity to obtain current weather information just prior to take-off. Davis could have sought a weather observation from Wussow, a certified weather observer, or he could have used the public telephone in the Dixon airport terminal to call the Rockford flight service station for information on the most recent surface observations along the flight route.

14. Knize could not be expected to foresee that Davis would ignore the adverse weather conditions around him and Knize's admonition that weather conditions were expected to deteriorate. Davis' take-off under these circumstances violated the FAR's requirement that he take responsibility for making an informed determination that the weather was suitable for VFRs flight. It was negligence on the part of Davis. The pilot's imprudent flight into adverse weather conditions cuts off any chain of causation linking any negligence on the part of the weather briefer and the subsequent crash. *Black v. United States*, 441 F.2d at 745.

15. As a final consideration, we do not know that Davis would have acted differently and avoided the crash had Knize conducted the weather briefing in a different manner. Davis might well have made up his mind to make the flight paying no attention to additional information in the briefing, just as he apparently paid no attention to the observable weather conditions prevailing at the Dixon airport when he arrived the morning of October 25, 1978. As it is unlikely that the weather briefing made a difference in Davis' decision to fly to Decatur, it was not a proximate cause of the accident that occurred when Davis chose to make the flight.

16. The plaintiff has failed to meet her burden of proof that the defendant's employee acted negligently in the manner in which he conducted the weather briefing of the decedent, Raymond E. Davis. Further, the plaintiff has failed to prove that the weather briefing in question was in any way a proximate cause of the crash of N–8666P which killed Davis.

Accordingly, the judgment entered on April 16, 1985 in favor of defendant and against plaintiff is now final and appealable; further, plaintiff's motion to amend findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(b), is denied.

So ordered.