**Barbara A. JACKSON, M.D., Administratrix of the Estate of Cephas W. Jackson, Jr., M.D., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV.A. 95–10146–GAO.**

United States District Court, D.Massachusetts.

Oct. 24, 1997.

---

Anthony Tarricone, Sarrouf, Tarricone & Flemming, Boston, MA, for Plaintiff.

Luke B. Marsh, U.S. Dept. of Justice, Civ. Div., Torts Branch, Washington, DC, for U.S.

## FINDINGS, RULINGS AND ORDER FOR JUDGMENT

O'TOOLE, District Judge.

This matter was tried to the Court sitting without a jury. Upon consideration of the evidence and the briefs and arguments of the parties, the Court makes the following findings of fact and rulings of law:

### FINDINGS OF FACT

On March 27, 1992, Cephas W. Jackson, Jr., M.D., flew his own private airplane from Little Rock Arkansas, to Charleston, West Virginia. On his approach to Charleston's Yeager Airport, the plane crashed, and both he and his passenger were killed. His widow, Barbara A. Jackson, M.D., brought this wrongful death action against the United States, claiming that negligence by personnel of the Federal Aviation Administration ("FAA") had caused the crash. Specifically, she alleges that FAA employees negligently failed to warn Jackson of dangerous icing conditions in the Charleston area, leading Jackson to fly unaware into conditions where ice accumulated on the outside surfaces of the plane, causing it to lose altitude and crash.

*Jackson's Training and Experience as a Pilot*

Jackson was a well-trained and experienced pilot, having first received his pilot's license in 1986. He was "instrument-rated," which meant that he was trained and competent to fly under Instrument Flight Rules ("IFR"). That is, he was trained to fly in weather conditions where he could not visually observe his flying environment but would need to rely on the aircraft's instrumentation along with the assistance of air traffic controllers.[1] In order to be certified to operate under IFR, a pilot must undergo extra training and possess a current instrument rating. *See* 14 C.F.R. § 61.65.

At the time of the crash, Jackson had logged approximately 500 hours of flight experience as a pilot. A surgeon by profession, he was a recreational pilot who flew almost every week. He had previously piloted long distance trips similar to the one he was on when he died.

Jackson's aircraft was a single-engine Mooney M–20M that was not equipped for flight in icing conditions. *See* Mooney Flight Manual, Ex. 101 at 3–16, 3–17. In fact, both the aircraft's operating manual and a placard

---

**1.** Pilots who are not instrument-rated may fly only under Visual Flight Rules ("VFR"), relying on their own ability to see where they are going, rather than upon the guidance of instruments.

Pilots flying under VFR conditions, for example, may not fly through vision-obscuring clouds, whereas pilots trained to fly under IFR, may do so. *See generally,* 14 C.F.R. §§ 61.3(e), 61.65.

inside the cockpit warned that it was not safe to fly the plane in icing conditions. The manual said:

### WARNING

### DO NOT OPERATE IN KNOWN ICING CONDITIONS.

The Model M20M is **NOT APPROVED** for flight into known icing conditions and operation in that environment is prohibited.

Mooney Flight Manual, Ex. 101 at 3–16.

As part of his original training as a pilot, Jackson attended a twelve-day course taught by John Murray, a certified flight instrument instructor. Murray recommended to Jackson that he read "Weather Flying" by Robert Buck, a book which gives detailed information about the dangers of icing. Murray told Jackson about the "warning signs for icing," i.e., freezing temperatures, moisture in the air, and a descent through clouds, and advised him to look for these conditions when departing and to obtain weather updates en route and before landing. Murray also told Jackson of his own personal experiences with icing. Specifically, he warned Jackson about an "ice belt" in the Appalachian region of the United States (including West Virginia) in which severe icing occurs.

Jackson had an extensive library of books and other materials relating to aviation, including books about various weather conditions that a pilot might encounter. Many of the books in his aviation collection contained warnings about flight in icing conditions.

#### The Pre–Flight Weather Briefing

The day before the accident, Jackson was in Little Rock, planning a trip back to his home in Norton, Massachusetts. Following customary procedures, he contacted the FAA's Automated Flight Service Station (AFSS) in Jonesboro, Arkansas, and requested weather information concerning his proposed flight from Little Rock, Arkansas, to Mansfield, Massachusetts, with a stop en route at Charleston, West Virginia. An AFSS is an FAA facility which, among other services, provides weather briefings to pilots both prior to flight and while en route.

Jackson requested an "outlook briefing" for an expected departure the following morning.[2] The briefer told him that it appeared that conditions would be satisfactory until he reached Charleston, West Virginia, where there was a "chance of some light snow showers," but that from West Virginia to Massachusetts there was a chance of light rain or snow showers across the entire route, with possible fog and severe easterly winds. Air Traffic Control Transcripts, Ex. 70, § A at 2–3. Jackson responded, "OK, well listen I'll uh I'll probably check again tomorrow . . . and if it sounds the same [I] think I'll roll over and go back to bed . . . ." *Id.* at 3.

The following day at about 8:30 a.m., Jackson again called the Jonesboro AFSS and spoke with Flight Services Specialist Robert Eldridge. Jackson gave Eldridge his flight plan, his IFR status, and the type of plane he would be flying. He told Eldridge he proposed to leave Little Rock at about 11:00 a.m. and expected to arrive at Charleston at about 2:30 p.m., Eastern Standard Time. Eldridge informed Jackson about weather conditions that could be expected along the planned route to Charleston. Of particular significance to this action, Eldridge told Jackson the following:

[A]t the present time you're looking at uh flight precautions uh in the oh let's see here from uh roughly Memphis to Charleston, West Virginia for moderate turbulence below ten thousand feet and over eastern

---

**2.** Three types of weather briefings are available: An *outlook* briefing, conducted when the proposed departure is six or more hours from the time of briefing, includes a report of expected adverse weather conditions, whether VFR or IFR conditions are expected, a synopsis of weather systems, and en route and destination forecasts.

A *standard* briefing is a comprehensive weather briefing conducted within six hours of departure and includes all information contained in an outlook briefing plus reports of current conditions, winds aloft, notices to airmen, and air traffic delays.

An *abbreviated* briefing is given when a pilot requests specific weather information or wishes to supplement a prior briefing. Flight Services Handbook, Ex 41, §§ 3–12, 3–10, 3–11.

Kentucky into West Virginia for uh occasionally moderate uh light to moderate rime icing[3] below twelve thousand feet in the clouds or in precipitation there's really not a lot of precipitation out there right now probably just be in the cloud layers uh other than that uh from here to Charleston West Virginia I don't see too much in the way of flight precautions. . . .

. . . .

. . . By the time you reach Lexington [Kentucky] they're starting to catch up with to the back side of that system and you begin to pick up scattered to broken cloud layers uh two to three thousand feet from Lexington on into Charleston now Charleston had some precipitation it's a little difficult to tell where the precipitation actually starts the latest national radar summary indicates uh just about the Charleston area you start to pick up some patchy precipitation they were reporting twenty seven hundred broken four thousand overcast seven miles and light snowshowers temperature thirty four degrees dewpoint of twenty four.

Their surface winds were two sixty at nine gusting to twenty one so it's a little blustery over there sounds like its snowing sideways.

Uh your forecast for uh that portion of your route doesn't sound too bad you're looking basically at those conditions uh continuing enroute now Charleston's terminal forecast uh from . . . ten am til four pm this morning it'll be central ceilings four thousand broken winds two ninety at ten gusting to twenty with occasional deterioration to ceilings two thousand overcast three miles and light snowshowers to light

rain showers but improvement after four pm twenty two Z.[4]

Air Traffic Control Transcripts, Ex. 70. § B at 3–4.

Eldridge also briefed Jackson about weather conditions for a flight from Charleston to the Boston area. He summed up:

> [T]aken all in all it doesn't look like you've got a real serious weather problem across that route you do have the flight precautions for turbulence and possibility of some icing.
>
> But as long as you stay on top of that I don't believe you have too much problem getting in making the entire trip today.

*Id.* at 5.

Eldridge did not specifically inform Jackson of some advisories that had been issued by the National Weather Service. These advisories, called AIRMETs and SIGMETs,[5] reported (among other things) that there might be icing and turbulence in the West Virginia vicinity. After he had received the weather briefing, Jackson filed an IFR flight plan for just the Charleston leg of his trip, expressing his intention to "get an updating in Charleston." *Id.* at 6–7.

### In–Flight Weather Briefings

At about 11:10 a.m., Central Standard Time, Jackson's aircraft, N9136J, received clearance to leave Little Rock. He traveled over Tennessee and Kentucky toward West Virginia. En route, he had radio communications with several FAA air traffic control facilities: Little Rock Tower, Memphis Center, Memphis Tower, Nashville Tower, Indianapolis Center, and Charleston Approach and the Charleston Tower.[6] At 2:38 p.m.,

---

3. "Rime" ice is whitish, opaque, rough-surfaced ice, like the frost that forms in a home refrigerator freezer. "Clear" ice is, as the name implies, smooth-surfaced and more or less transparent. "Mixed" ice is a combination of the two.

4. Aviation operations are generally conducted with reference to Coordinated Universal Time ("UTC") or Greenwich Mean Time (also known as ZULU Time). On March 26–27, 1992, UTC time was six hours ahead of Central Standard Time and five hours ahead of Eastern Standard Time.

5. An AIRMET is an advisory concerning weather conditions that are "potentially hazardous to aircraft having limited capability." Flight Services Handbook, Ex. 41, Glossary at 4. A SIGMET is an advisory concerning "weather significant to the safety of all aircraft. SIGMET advisories cover severe and extreme turbulence, severe icing, and widespread dust or sandstorms that reduce visibility to less than 3 miles." *Id.* at 57.

6. Pilots traveling enroute may communicate with an Air Route Traffic Control Center ("ARTCC" or "Center"). Once pilots approach a terminal point, they switch to communications with the

Eastern Standard Time, Jackson, in contact with the Indianapolis Center, requested and was granted permission to ascend to 9,000 feet in order to rise above the cloud deck.

Shortly thereafter, Jackson contacted Indianapolis Hazard Sector.[7] At 2:47 p.m., the air traffic controller on duty received a Pilot Report (a "PIREP") that reported moderate rime icing had been encountered by a plane while traveling out of Charleston. A PIREP is "[a] report of meteorological phenomena encountered by aircraft in flight." Flight Services Manual, Ex. 41 at A–46. The controller relayed this PIREP information to the Charleston ATCT but she did not broadcast it to pilots generally nor communicate it specifically to pilots, like Jackson, who might be headed toward that weather. However, at about the same time, in response to an inquiry by another aircraft, the controller gave the following report:

> Charleston Approach advises their.uh one thousand three hundred overcast solid IFR moderate mixed icing inbound to Charleston it's clear to the south ah the only PIREP that I can tell ya is moderate ice south of Charleston on bases are two thousand MSL.

Air Traffic Control Transcripts, Ex. 20,. § A at 7. It is probable that Jackson was monitoring the same radio frequency as the pilot who gave the PIREP and that he therefore heard it.[8] Even if that were not true, however, he would have heard the controller's report of icing because pilots are able to hear all communications of a controller, even those communications, conducted on different frequencies.

As Jackson was approaching Charleston, the Charleston ATCT received six PIREPS from 3 or 4 different aircraft all reporting encounters with icing conditions. The evidence did not indicate what radio frequencies most of the reports were carried on, so it cannot be determined whether Jackson heard all of them. One of the reports was made by a pilot using the same frequency as Jackson, so it is likely that he heard that PIREP. The Charleston ATCT did not re-communicate the PIREPs either generally or specifically to Jackson. However, in response to an inquiry from another pilot, the radar controller did report that there had been "numerous reports for light to moderate mixed and rime icing by numerous aircraft." Air Traffic Control Transcripts, Ex. 70, § E at 8. Again, since the radar controller can be heard by all aircraft, it is likely that Jackson heard that report.

When Jackson first established contact with the Charleston ATCT at 3:13 p.m., Eastern Standard Time, he was asked by the controller whether he had received the latest weather information being broadcast on Charleston's Automatic Terminal Information System (ATIS). Jackson confirmed that he had. The ATIS recording, which was updated every hour, provided the following weather information:

> Good afternoon charleston tower atis information delta charleston two zero zulu weather measured ceiling one thousand three hundred overcast visibility seven light snow grains temperature three four dewpoint three one wind two six zero at one zero altimeter three zero zero zero precipitation very light expect i l s approach runway two three departing runways two three and three three notice to airmen Charleston v o t is on the air but not to be used for receiver checks advise you have delta.

Air Traffic Control Transcripts, Ex. 20, § C.

The ATIS message conveyed some important information to Jackson about the weath-

---

local Air Traffic Control Tower ("ATCT" or "Tower").

7. The Indianapolis Center serves a jurisdiction comprising all or parts of seven states, including Kentucky and West Virginia. The airspace within the Indianapolis jurisdiction is divided geographically into a number of different sectors, each of whom communicates with aircraft on different radio frequencies. During his flight to Charleston, Jackson was in contact with the London and Hazard Sectors.

8. FAA regulations require every pilot operating under IFR conditions to maintain "a continuous watch" on the appropriate frequency. 14 C.F.R. § 91.183. Nothing in the evidence indicates that Jackson did not comply with that obligation. In fact, the transcripts of radio transmissions indicate that throughout the flight, he promptly— within a few seconds—responded to any communications directed to him. This indicates that he was listening and paying attention to the radio.

er conditions at the Charleston airport. It advised him that it was overcast and that the ceiling (the height of the clouds above ground level) was 1300 feet. It told him that he should expect an instrument landing, which meant that he would descend through the clouds in order to land. The ATIS report also told him the temperature at ground level was just above freezing and that the relative humidity was high. Experienced pilots like Jackson would realize that the air temperature several hundred feet above the ground would likely be somewhat lower, and in this case, below freezing. The ATIS recording also said that there was precipitation at the Charleston airport. All of this information told Jackson that the conditions existed for the formation of ice on the plane as it descended for a landing.

As he approached the airport at an altitude of 9000 feet, Jackson was flying in freezing temperatures. At 3:21 p.m., he accepted a clearance to descend into the clouds and fly at 5000 feet in preparation for his final landing approach. About seven minutes later, Jackson was instructed to descend from 5000 feet to 3000 feet, and a few minutes after that he was instructed to execute two turns and maintain an altitude of 2600 feet until he was cleared for his final approach. He promptly acknowledged and complied with each of the instructions, giving no indication of any difficulty.

At 3:36 p.m., Jackson was asked by the air traffic radar controller to contact the local tower on a different frequency. Jackson confirmed the instruction, but shortly afterward, radar showed that his plane had descended too *low* and had flown off the prescribed approach course at almost a ninety degree angle, away from the direction of the airport. The local controller told Jackson that he had gone below the minimum altitude. The transcript indicates a response from Jackson that was garbled by static.

The local controller, following instructions from the radar controller, directed Jackson to climb to a safer altitude and turn to the northeast, at a compass heading of 70 degrees. Jackson acknowledged by saying, "Three six Juliet, zero seven zero," indicating that he was complying with the direction.[9]

Jackson's plane flew over a ridge in Young's Bottom, West Virginia, at a heading of approximately 70 degrees. At about 3:40 p.m., it lost altitude, rocked from side to side, and crashed into a hillside. Both Jackson and his passenger were killed by the impact. After the crash, long, thin pieces of ice were found near the wreckage.

### CONCLUSIONS OF LAW

This action is brought against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 *et seq.* The Court must apply the whole law, including choice of law rules, of the state where the alleged negligence took place. 28 U.S.C. § 1346(b); *Richards v. United States,* 369 U.S. 1, 8–9, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962); *Bonn v. Puerto Rico Int'l Airlines,* 518 F.2d 89, 91 (1st Cir.1975). The parties agree that, since the last alleged negligence occurred in West Virginia, the law of that state should govern. *See Bowen v. United States,* 570 F.2d 1311, 1318 (7th Cir. 1978). *See also Paul v. National Life,* 177 W.Va. 427, 352 S.E.2d 550, 555–56 (1986).

Under West Virginia law, the plaintiff in a negligence action must prove that the defendant failed to perform a duty owed to the plaintiff and that the failure proximately caused the plaintiff's injury. *Yeager v. Morgan,* 189 W.Va. 174, 429 S.E.2d 61, 63–64 (1993). An act, or a failure to act, is the proximate cause of a person's injury where the injury was the natural and probable consequence of the act and ought to have been foreseen in light of the attending circumstances. *Matthews v. Cumberland & Alle-*

---

9. The plaintiff alleges that the controller negligently directed Jackson to turn right to achieve the 70 degree heading. Because his plane was headed southeast at approximately 135 degrees when the direction was given *(see* Cauble Report, Ex. 51 at 3), turning right the plane had to turn about 295 degrees to achieve a 70 degree heading, whereas turning left, it would have only had to turn 65 degrees. No one would have realized that more than Jackson, who accepted the direction. He did not have to follow it if he thought it was too dangerous. It was "his primary duty to avoid a hazard that he himself could or should have perceived." *In re N–500L Cases,* 691 F.2d 15, 31 (1st Cir.1982).

**280**

*gheny Gas Co.*, 138 W.Va. 639, 77 S.E.2d 180, 189 (1953). However, under the West Virginia rule of comparative negligence, a plaintiff is barred from recovering damages in a tort action if his negligence or fault equals or exceeds the combined negligence or fault of the other parties involved in the accident. *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879, 885 (1979).

The plaintiff alleges that the FAA personnel at Jonesboro, Indianapolis, and Charleston, West Virginia, negligently failed to inform Jackson of the existence of icing conditions on the approach to Charleston's Yeager Airport. As a result of their negligent failure to warn him of the danger, she contends, Jackson flew into the icing conditions and when ice formed on the aircraft he lost control and the plane crashed. The duty to provide up-to-date and accurate weather information arises, the plaintiff argues, from the regulations and procedures promulgated in certain FAA manuals. *See Delta Air Lines v. United States*, 561 F.2d 381, 389 (1st Cir.1977) (" [T]he Government's duty of care in the maintenance and promotion of a safe and efficient air traffic control system is defined in part by the provisions in the procedure manuals.")

*Negligence by Pre–Flight Weather Briefer*

First, the plaintiff alleges that Jonesboro flight service specialist Eldridge gave an incomplete and misleading pre-flight weather briefing, in derogation of his responsibilities under the Flight Services Handbook, Ex. 41, by omitting to convey to Jackson certain weather information that was available to Eldridge. The Handbook required him to familiarize himself with aeronautical and weather conditions (Ex. 41, ¶ 3–1 at 3–1–1); to obtain the route of flight, altitude, and time enroute of Jackson's flight (Ex. 41, ¶ 3–10(a) at 3–2–1); and to provide Jackson with all sources of weather and aeronautical information, including the AIRMETs and SIGMETs then available (Ex. 41, ¶ 3–10(b) at 3–2–1).[10] The plaintiff also alleges

that Eldridge inappropriately expressed his personal opinion concerning the likely effect of the weather conditions on the flight.

Eldridge was not negligent. First, he had adequately informed himself in order to give an appropriate briefing. He had himself obtained a pre-duty briefing by obtaining information about weather trends, flight precautions, current weather, unusual activity in the local area, and similar matters. He also obtained from Jackson information about Jackson's planned route, flight time, and altitude. Air Traffic Control Transcript, Ex. 70, § B at 6–7.

With respect to the content of the standard briefing given to Jackson, Eldridge was directed by the Flight Services Handbook to "[b]rief by translating, interpreting, and summarizing available data for the intended flight." Flight Services Handbook, Ex. 41, ¶ 3–10(a) at 3–2–1. It is not clear that the contested AIRMETs or SIGMETs were available to Eldridge at that time. There seem to have been some problems with the ability of the computers being used at the time to make all such information available to flight service specialists. More importantly, the Handbook instructs flight service specialists: "Do not read individual weather reports or forecasts unless, in your judgment, it is necessary to emphasize an important point or unless specifically requested to do so by the pilot." *Id.* The regulation thus allows the flight service specialist some degree of discretion or judgment as to what weather information to pass on. *See Moorhead v. Mitsubishi Aircraft Int'l*, 828 F.2d 278, 282 (5th Cir.1987). In light of the considerable weather information Eldridge did give Jackson, his omission to summarize specific AIRMETs and SIGMETs was not significant, and it was not negligent.

Eldridge advised Jackson that he could expect "light to moderate rime icing below twelve thousand feet in the clouds or in precipitation" from eastern Kentucky into West Virginia. Air Traffic Control Tran-

**10.** The Flight Services Handbook "prescribes procedures and phraseology for use by personnel providing flight assistance services, Flight service, station specialists are required to be familiar with the provisions of this handbook that pertain to their operational responsibilities and to exercise their best judgment if they encounter situations not covered by it." Flight Services Handbook, Ex. 41, Foreward at 1.

scripts, Ex. 70, § B at 3. Those are exactly the conditions Jackson eventually encountered. Eldridge also accurately conveyed the local weather conditions reported at the Charleston airport, including "patchy precipitation," "light snow showers," and near freezing temperatures at the airport. *Id.* Again, those are generally the conditions that existed when Jackson arrived at Charleston. The parties parried at trial over whether "snow showers" were the same as "snow grains" and whether "drizzle" was different yet again. The controversy is immaterial. The duty to provide data sufficient to inform the pilot of the conditions he might reasonably encounter does not include the duty to fine-tune the weather details to the degree the plaintiff seems to contend. Moreover, on the evidence it simply cannot be said that Jackson, having heard what he did from Eldridge, could have misunderstood that icing conditions were a real possibility in the Charleston area. Not only did Eldridge actually say so in so many words, but he also gave additional data which would have led an experienced pilot like Jackson to the same conclusion.

■ Finally, Eldridge's comments that the forecast "doesn't sound too bad," that "its not unmanageable to Charleston," or that he didn't "see much in the way of flight precautions" are not themselves a basis for liability, as the plaintiff argues. These general opinions, even if inappropriate, could not have negated the specific, accurate weather information that Eldridge gave to Jackson. As the pilot, Jackson had the sole responsibility for determining whether it was safe to undertake the flight. *See Davis v. United States,* 643 F.Supp. 67, 77 (N.D.Ill.1986), *aff'd,* 824 F.2d 549, 552 (7th Cir.1987). Indeed, it might even have been negligent for Jackson, as an experienced pilot responsible for his own safe flying, to have disregarded or minimized the specific data provided and instead to have relied on the flight service specialist's casual encouragement.

*Negligence by Air Traffic Controllers*

■ The plaintiff also alleges that the air traffic controllers at Indianapolis and Charleston were negligent in failing to relay to Jackson the numerous reports they had received from other pilots (PIREPs) about icing in the Charleston area. The Air Traffic Control Manual requires air traffic controllers to "[r]elay pertinent PIREP information to concerned aircraft in a timely manner." Air Traffic Control Manual, Ex. 39, ¶ 2–102(d) at 2–6–2. "Significant PIREP information includes reports of strong frontal activity, squall lines, thunderstorms, light to severe icing, windshear and turbulence (including clear air turbulence) of moderate to greater intensity, or other conditions pertinent to flight safety." *Id.,* § 2–102 at 2–6–1.

As described above, the controller at Indianapolis received one PIREP about icing and the radar controller at Charleston received six. None of these reports were directly communicated to Jackson. These PIREPs were "pertinent" information to a pilot, like Jackson, who was flying into Charleston airspace. The failure to communicate these reports to him in a "timely manner" was contrary to the Manual's directive.

The Manual also directs air traffic controllers to "[g]ive first priority to separating aircraft and issuing safety alerts as required in this [Manual]. Good judgment shall be used in prioritizing all other provisions of this [Manual] based on the requirements of the situation at hand." Air Traffic Control Manual, Ex. 39, ¶ 2–2(a) at 2–1–1 The controllers should "[p]rovide additional services to the extent possible, contingent only upon higher priority duties and other factors including limitations of radar, volume of traffic, frequency congestion, and workload." *Id.,* ¶ 2–2(b) at 2–1–1.

The United States points to these directives to excuse the omission by the controllers to convey the icing PIREPs to Jackson. It is true that reporting weather conditions to pilots is a lower priority for an air traffic controller than keeping aircraft safely separated, and that if circumstances limited what a controller could attend to, relaying PIREPs could be omitted.

Nonetheless, it does not appear that the Charleston controller was so busy that he could not have found time to communicate the icing PIREPs to Jackson. Jackson's

plane was certainly a "concerned aircraft" in the meaning of the Manual directive. It was not only in Charleston airspace, it was heading to a landing in Charleston. It was going to have to descend through the clouds—the icing conditions—in order to land. Moreover, as the controller knew, it was a type of aircraft not equipped for flight in icing conditions.

The Charleston radar controller's omission to convey any of the information he had from PIREPs and other sources that icing was a present phenomenon in the approach to the Charleston airport was negligent. *See Delta Air Lines*, 561 F.2d at 389–90 ("While failure to conform to every mandatory Manual procedure, however trivial the deviation, would not necessarily constitute negligence, and while it might not be negligent to deviate from established procedures in the face of a higher priority concern, nonetheless a substantial and unjustified failure to follow procedures made mandatory by the Manual is persuasive as an indication of a lack of due care. ").[11]

### Jackson's Negligence

■ As the pilot, Jackson had the primary responsibility and final authority over the safety of his aircraft. 14 C.F.R. § 91.3. *See Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972). The pilot is in command of the aircraft and must be aware of those facts that pertain to its safe operation. *Davis v. United States*, 824 F.2d 549, 551 (7th Cir.1987) (citing *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir.1982) and *American Airlines v. United States*, 418 F.2d 180 (5th Cir.1969)).

The evidence firmly established shows that Jackson was given ample warning that icing conditions were likely to exist. He learned that information first from the weather briefing he received before undertaking the trip at all. Having been so warned, he then had the affirmative duty to seek out and obtain further information en route about the existence or extent of icing at Charleston. *See Black v. United States*, 441 F.2d 741, 744

(5th Cir.1971) ("It is first of all up to the pilot to determine whether dangerous weather conditions prevail along his intended route. He must stay on the alert in the course of his flight. He must listen and give heed to the broadcasts of weather reports that could endanger him and his passengers."); *Somlo v. United States*, 416 F.2d 640 645 (7th Cir. 1969) (It was the pilot's duty "having been warned of the possibility of icing to inquire whether icing was still a factor.").

There is no evidence in any of the transcripts of communications between Jackson and various FAA facilities that Jackson ever inquired about the icing conditions he had been warned about. There is no apparent reason why he could not have done so. The transcripts show that other pilots inquired about icing, and when they did, the controllers accurately passed on the information they had. It can be inferred that if Jackson had inquired, he would also have been given that information. Additionally, Jackson could have obtained pertinent weather information from an FAA service (the "En Route Flight Advisory Service" or "EFAS") dedicated to that purpose. *See* Airman's Information Manual, Ex. 42, ¶ 7–4 at 7–1–4.

Moreover, as noted in the findings of fact, it is probable that Jackson actually did hear reports of icing in the Charleston area while he was en route. He was further alerted to the existence of icing conditions by the ATIS recording, which he acknowledged he had listened to, advising him in effect that he would be descending for almost his entire approach through thick overcast in light precipitation and freezing temperatures—conditions that would likely mean ice.

In addition, he had his own observations. His aircraft had an outside air temperature gauge which would have told him that he was flying in freezing temperatures and therefore vulnerable to icing if he flew into the clouds. If ice began to form on his plane, he likely would have seen it. The whitish ice would have been distinctly visible on the red-colored wings of his plane. Indeed, Mrs. Jack-

---

11. The Indianapolis Hazard Sector controller's omission to pass on one PIREP was too isolated an error to support a conclusion of negligence by

itself. In any event, it had no proximate causal relationship to the accident.

son had testified that she had been on a flight with her husband in which she had seen ice developing on the wings of the plane. When she brought it to her husband's attention he immediately requested clearance from the air traffic controller to go to a different altitude to avoid the danger. It is worth remarking that PIREPs represent the observations made by pilots who themselves notice the ice forming on their aircraft.

In these circumstances, it is highly unlikely that Jackson ·was unaware of either the potential for icing or the actual accumulation of ice on his plane as he approached the Charleston airport. On the contrary, the evidence convincingly indicates that he had several sources from which he was in fact aware of the conditions. He apparently decided, for whatever reason, to try to fly through the conditions, even though his plane was not equipped to do so. In making that tragic mistake, he acted negligently.

■ He violated two Federal Aviation Regulations. He flew the plane contrary to its specified operating limitations in violation of 14 C.F.R. § 91.9. As noted, the Mooney Operating Manual prohibited flight in known icing conditions. And he operated the plane carelessly or recklessly so as to endanger the life of his passenger in violation of 14 C.F.R. § 91.13. Under West Virginia law, violation of safety regulations is evidence of negligence. *See Waugh v. Traxler,* 186 W.Va. 355, 412 S.E.2d 756, 759–60 (1991); *Miller v. Warren,* 182 W.Va. 560, 390 S.E.2d 207, 208–09 (1990). *See also, Stone v. United Eng'g,* 197 W.Va. 347, 475 S.E.2d 439, 454–55 (1996). Violation of FARs has specifically been found sufficient to support a conclusion of negligence on the part of a pilot. *See Bowen v. United States,* 570 F.2d 1311, 1319–20 (7th Cir.1978); *Davis v. United States,* 643 F.Supp. 67, 77–78 (N.D.Ill.1986), *aff'd,* 824 F.2d 549 (7th Cir.1987).

■ Jackson's negligence was greater than the negligence of the air traffic controller who did not pass on the icing PIREPs.

Jackson had the primary responsibility for the safe operation of his aircraft, and he had the specific obligation to observe the operational limitations of the aircraft. His default in this respect was far more serious than the omission of the controller to convey the PIREPs. That latter duty, while a genuine one, was relatively a subordinate one to the controller's primary responsibility to keep aircraft separated in the relevant airspace. It was simply not as urgent and unrelieved a duty as the pilot's duty to avoid dangerous flying conditions or maneuvers.

Under West Virginia's statute, an action for wrongful death may be brought if the party injured would have been entitled to recover damages had death not ensued. W. Va.Code § 55–7–5 (1996). Because his negligence exceeded the controller's, Jackson himself could not have recovered. *See Bradley v. Appalachian Power* Co., 163 W.Va. 332, 256 S.E.2d 879, 885 (1979) It follows that the plaintiff may not recover under the statute either.

### Causation

■ A separate ground leads to the same conclusion. Even if the crash happened because ice had formed on the wings or other surfaces of the plane, the *negligence* of the air traffic controller in failing to pass on the PIREPs was not a proximate cause of the accident. The omission did not deprive Jackson of pertinent information he did not already know. He knew both when he left Little Rock and as he approached Charleston that icing conditions existed in the vicinity of his landing descent. Moreover, it is more likely than not that he actually heard some of the PIREPs at issue, as well as the Tower s response to one of them. The evidence simply does not support the plaintiff's theory that Jackson flew unaware into the icing conditions. His own negligence in persisting in flying into what he knew were icing conditions was the sole proximate cause of the accident.[12]

12. This resolution of ·the causation question assumes, as noted, that ice caused the crash. In fact, the evidence of that was rather limited and not particularly convincing. In sum, the evidence that supports the conclusion that the crash was caused by ice was that (1) the plane was observed to be flying erratically just before it crashed, as if the pilot was having difficulty controlling it, (2) ice accumulation can cause planes to become uncontrollable and to crash, and (3)

### Conclusion

For the foregoing reasons, judgment shall be entered for the defendant on all counts of the complaint.

It is SO ORDERED.

ice was found near the wreck that appeared to have come from the wings of the plane. That evidence is sufficient to warrant the conclusion that ice *might have* caused the plane to crash, but it does not prove that it *did*. There is evidence that points to some other cause, such as an acute health emergency like a heart attack. First, the transcripts show that Jackson never made any complaint about ice or any difficulty in controlling the plane, as one or two other pilots did in the same time period. Second, the audio tapes of the transcripts indicate a change in Jackson's voice quality in the last few transmissions, suggesting that he might have been physically affected by something. Third, the initial unexplained maneuver of the plane—departing from the approach path at a right angle—is not indicative of the kind of effect that icing would typically have. Finally, Jackson acknowledged and seemed to be able, at least initially, to execute the turn he was instructed to make just before the crash, suggesting that he did retain effective control over the maneuverability of the aircraft at that time. In the end, the evidence supporting the proposition that icing caused the crash was simply not strong enough to justify that conclusion.