**AIRPLANES OF BOCA, INC.**, a Delaware corporation.; Jeffrey S. Mintz, as personal representative of the Estate of Michael D. Mintz; Penni–Sue Vera, as personal representative of the Estate of Enid Mintz; John P. Seiler, Adm. Ad Litem of the Estate of Joel Mintz, Plaintiffs,

v.

**UNITED STATES of America, by its FEDERAL AVIATION ADMINISTRATION, Defendants.**

No. 01–8028–CIV.

United States District Court,
S.D. Florida,
West Palm Beach.

March 14, 2003.

Francis J. Carroll, Jr., Boehm Brown Seacrest & Fischer, Frank Bradley Hassell, Eubank Hassell & Moorhead, Daytona Beach, Don Howarth, Howarth & Smith, Los Angeles, CA, Robert L. Parks, Jeannete Lewis Bologna, Haggard Parks Haggard & Bologna, Coral Gables, for Airplanes of Boca, Inc., a Delaware corporation, the Estate of Enid Mintz, plaintiff.

Maureen Donlan, United States Attorney's Office, Miami, Steven J. Riegel, United States Department of Justice, Torts Branch, Civil Division, Washington, DC, David I. Mellinger, AUSA, United States Attorney's Office, Fort Lauderdale, Stephen V. Dunn, Federal Aviation Administration, Office of the Chief Counsel, Washington, DC, for United States of America, by its Federal Aviation Administration, defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYSKAMP, District Judge.

### I. *Findings of Fact*

#### A. *The Pilot*

On January 21, 1998, Mr. Michael D. Mintz held a commercial pilot certificate permitting him to fly single- and multi-engine land airplanes in instrument conditions, and a current second-class medical certificate. Mr. Mintz. had a total of approximately 1606 hours of flight time, of which 843 hours were in the Gulfstream Commander 695A aircraft, N269M, which he owned and operated personally through a corporation (Airplanes of Boca, Inc.). Of that 843 hours in that aircraft, 389 hours were as pilot in command. Mr. Mintz had logged 72 hours in N269M within the previous 90 days, 41 hours within the preceding 30 days, and 7 hours within 24 hours preceding the accident. On the evening before the accident, Mr. Mintz piloted at least four of the seven hours in nighttime conditions.

#### B. *The Aircraft*

The Gulfstream Commander 695A aircraft is a complex, high-performance, twin turboprop aircraft equipped for flight in instrument conditions under instrument

flight rules (IFR). It is considered a "corporate" aircraft, designed for two pilots but which may legally be operated by one under 14 C.F.R. Part 91. On the day of the accident, N269M was in airworthy condition. There is no evidence of equipment malfunction. The aircraft N269M was equipped with a Bendix RDR 1150HP Color Weather Radar featuring "Weather Mapping With Alert" which blinks continuously when a Video Integrator and Processor (VIP) Level 3 or greater (red) storm is present. The aircraft was also equipped with a 3M model WX–11 Stormscope, a device which detects lightning strikes, an indication of the thunderstorm activity. Both devices were fully capable of providing the pilot with sufficient information to avoid flying into thunderstorms and other convective weather. Both devices were operational at the time of the accident flight. On the day of the accident, N269M had a value of $1,534,000.00, to which the parties have stipulated.

### C. *The Weather Briefing*

At 1919 UTC [1] Mr. Mintz telephoned the Miami Automated International Flight Service Station (MIA AIFSS) and filed an instrument flight plan from Boca Raton, Florida to Gwinett County Airport in Lawrenceville, Georgia. After filing the flight plan he requested and received a standard weather briefing, which he was provided in accordance with the provisions of FAA Order 7110.10L, *Flight Services* handbook, Chapter 3–1–1. The standard weather briefing Mr. Mintz received met all the applicable elements that the *Flight Services* handbook prescribes for a standard weather briefing and accurately translated and described the weather information in the vicinity of Boca Raton Airport and along N269M's proposed route of flight. The MIA AIFSS specialist taking the call was Mr. Michael C. Miller. At all relevant

times, Mr. Miller acted within the course and scope of his employment. There were no weather advisories or warnings (e.g., SIGMETs, AIRMETs, etc.) in effect for Mr. Mintz's proposed route of flight.

At 2028 UTC, Mr. Mintz called on the radio to the Palm Beach Approach Control to activate the instrument flight plan for N269M to Gwinett County Airport. (Transcript at 2028:10). FAA Air Traffic Control Specialist John Boyle, working at Palm Beach Approach Control, read N269M its clearance, listened to the readback, and told the pilot to hold (on the ground) for release into the air traffic control system. (Transcript at 2028:20). Mr. Mintz acknowledged the clearance and stated he was first in line for takeoff at Boca Raton. (Transcript at 2028:58). At this point, Mr. Mintz's onboard weather radar was unimpeded by buildings and, presumably, other aircraft. After coordinating a reservation of protected TFR airspace for N269M, Mr. Boyle asked Mr. Mintz if he was able to go "north bound" after departure. (Transcript at 2029:17). Mr. Mintz answered ". . . yeah, we will be right in the soup immediately however." (Transcript at 2029:22). The phrase "in the soup" is generally understood by pilots and air traffic controllers alike to mean in clouds or precipitation. The phrase does not imply hazardous weather to a competent instrument pilot or an air traffic controller. Mr. Boyle asked N269M again, "you can do that?" Mr. Mintz replied, "yes sir I can." (Transcript at 2029:27). This was reasonably understood by Mr. Boyle as meaning Mr. Mintz accepted the clearance as given. At all relevant times, Mr. Boyle acted within the course and scope of his employment.

---

1. All transcript times are in Coordinated Universal Time (UTC) and expressed in a 24–hour format. Eastern Standard Time (EST) is five hours behind UTC.

Mr. Mintz, therefore, knew about the weather in the vicinity of Boca Raton Airport from at least three sources:

(a) the standard weather briefing he had received from MIA AIFSS;

(b) his own observations made on the airport, as evidenced by the pilot report he provided to inbound flight Caravan 100US. Both the pilot experts who testified at trial agreed that the pilot giving the report was Mr. Mintz; and

(c) the color weather radar unit and stormscope on board N269M.

Additionally, if Mr. Mintz had gone to the fixed base operator Boca Aviation, he would have had available a flight planning facility with color weather radar. Mr. Mintz could use his onboard weather radar on the ground before departure, and in the air after takeoff to look for radar returns indicating the presence of convective weather. After receiving his clearance from Mr. Boyle, Mr. Mintz had four options:

(a) accept the clearance as given by the controller;

(b) advise the controller he would need to fly a different heading after takeoff to avoid weather;

(c) advise the controller he would delay departure until the weather clears; or

(d) contact the Flight Service Station to get an up-to-date weather briefing. Mr. Mintz chose to accept the clearance as given by Mr. Boyle.

### D. *The Departure of N269M*

Mr. Mintz taxied N269M from where it was parked on the airport to the departure end of Runway 5. During the taxi, Mr. Mintz had opportunities to use his onboard weather radar to scan in the direction of his intended flight path. He was also able to observe continuously the local weather conditions through the aircraft's windows. The flight was shortly thereafter released for departure. (Transcript at 2029:29.) N269M reported airborne at 2031 UTC (Transcript at 2031:45) and turned northwest to a magnetic heading of approximately 320 degrees climbing to an intermediate altitude of 5,000 feet mean sea level (MSL). After Mr. Mintz retracted the landing gear following takeoff, his checklist workload was light and was to remain so until reaching an altitude of 10,000 feet.

During the brief flight, Mr. Mintz did not request or take a deviation around weather, even though the Federal Aviation Regulations would have permitted him to do so. Mr. Mintz also did not report any encounter with moderate or severe turbulence to air traffic control as required by the FARs. After leveling off at 5,000 feet, N269M accelerated to an airspeed in excess of the recommended Maneuvering Speed, as set forth in the manufacturer's Pilot Operating Handbook, for a Gulfstream Commander 695A with a gross weight of 10,500 pounds, which was approximately 137 KCAS. At no time during the flight did Mr. Mintz slow down to the recommended Moderate Turbulence Penetration Speed of 180 KCAS. This is additional evidence that Mr. Mintz never encountered moderate or severe turbulence before the hard left turn at 2034:18. At approximately 2034 UTC, Mr. Boyle noticed that N269M was in a hard left turn away from its assigned heading and asked, "six nine mike, what is your heading." (Transcript at 2034:29.) Mr. Mintz responded, "niner mike is in trouble." (Transcript at 2034:31.) That was the only indication from the pilot that he was in trouble. It was also the final radio transmission from N269M. At approximately 2034 UTC, Mr. Mintz lost control over N269M, which entered a steep left spiral descent ending in a nose-down crash. A comparison of the location of the last recorded radar hit with the ground impact

site demonstrates a nearly vertical, high-speed descent. Mr. Mintz and his passengers died instantly in the crash.

E. *Palm Beach Air Traffic Control*

Mr. John Boyle, the Palm Beach Arrival Radar controller who spoke to N269M, was fully qualified to serve as a full performance level radar controller in the position he occupied on the day of the accident, which was the South Arrivals (AR–F) scope. Mr. Boyle was operating an ASR–8 radar system which is designed to control air traffic, not to detect weather. The ASR–8 radar can detect precipitation echos, but cannot distinguish its type or intensity.

In accordance with the Federal Aviation Administration's national policy, Mr. Boyle could not see and was not trained to use the Terminal Doppler Weather Radar (TDWR) Geographical Situation Display (GSD) positioned behind the supervisor's desk. The GSD was and is reserved for use by the supervisor for flow control and strategic planning purposes. One reason for this policy is that the use of the GSD by radar controllers would distract from the primary mission of keeping aircraft separated and cause an information "overload." Additionally, the supervisor, Mr. Kevin Martin, had no requirement to pass along to controllers the sort of weather information that plaintiffs claim should have been passed to John Boyle. Likewise, the controllers had no requirement to familiarize themselves with the weather displayed on the TDWR GSD before assuming a radar position.

 With respect to the foregoing paragraph, the defendant United States is immune from liability for the placement, use and training on the TDWR system because of the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). The United States is also immune from liability pertaining to the staffing of the radar control room facility at Palm Beach Tower for the same reason.

The Air Traffic Control Manual (ATCM), FAA Order 7110.65, § 1–1–1 states: "Controllers are required to be familiar with the provisions of this order that pertain to their operational responsibilities and to exercise their best judgment if they encounter situations that are not covered by it." In this case, controller John Boyle did not issue any weather information to N269M because, in his judgment, the precipitation echo return on his ASR–8 radar display was not significant. The Air Traffic Control Manual (ATCM), FAA Order 7110.65J, § 2–1–1 states:

> The primary purpose of the ATC system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic. In addition to its primary function, the ATC system has the capability to provide (with certain limitations) additional services. The ability to provide additional services is limited by many factors, such as the volume of traffic, frequency congestion, quality of radar, controller workload, higher priority duties, and the pure physical inability to scan and detect those situations that fall in this category.

Radar observed weather falls under the "additional services" provision of this section.

The ATCM, § 2–6–4, directs controllers to: "Issue pertinent information on observed/reported weather or chaff areas. Provide radar navigational guidance and/or approve deviations around weather or chaff areas *when requested by the pilot.*" (Emphasis added.) The accompanying note says, "Weather significant to the safety of aircraft includes such conditions as tornadoes, lines of thunderstorms, embedded thunderstorms, large hail, wind shear, moderate to extreme turbulence (including

CAT (Clear Air Turbulence)), and light to severe icing." None of these weather phenomena existed in the vicinity of Mr. Mintz's aircraft. Additionally, "observed" weather means observed by pilots, the National Weather Service (as relayed in SIGMETs, AIRMETs, and flight precautions), or, in Palm Beach, the Control Tower (which has windows). Mr. Boyle also testified that there were no windows in the radar room from which to look outdoors.

### F. *Meteorology*

No surface weather observations were made at Boca Raton Airport (BCT) at the time of the accident. The nearby weather observations were available from: Ft. Lauderdale Airport (FLL), 22 miles south of BCT; Fort Lauderdale Executive (FXE), 13 miles south; Pompano Beach (PMP), nine miles south; Palm Beach International (PBI), 15 miles north; and Miami International (MIA), 42 miles south. The surface weather observations from these reporting stations, from a period extending from about 1850 to 2050 UTC indicate easterly winds at 9–15 knots, rain showers in the accident vicinity, and temperatures of 72–73 degrees F. At the time of the accident, the closest stations (FLL, FXE, PMP) reported scattered cloud bases at 1000–1500 feet, broken cloud bases at 2000–3000 feet, and overcast at 2900–20,000 feet. The weather radar data from the Miami weather radar (KAMX) for the same period indicate the presence of several lines of convective clouds, with the clouds aligned east-west, parallel with the nearby stationary warm frontal surface. These were typical, warm-frontal rain bands. Such rain bands can frequently produce copious rain and generally are not particularly turbulent. There were no reports of lightening or thunder in the convective clouds. The rain cells were moving and evolving slowly. The storm cell N269M flew into extended from the north-northwest side of the airport, out about 10 miles, and included maximum reflectivities of up to 45 dBZ. The cloud base was between 1500 and 2000 feet msl. The storm cells to the west-northwest of Boca Raton had tops of 16,000 feet msl. These were storm cells of normal nature for the area and season; they were not particularly or unusually intense.

Radar reflectivities along the flight path ranged from 20 to 40 dBZ, which correspond to light to heavy rainfall. N269M's route of flight was within the edge of the storm cell, but avoided major precipitation areas. The route of flight should have been navigable, without undue problems, under instrument meteorological conditions, by a competent IFR-rated pilot. The storm was easily visible on the airborne weather radar aboard N269M, either on the ground in preparation for departure from Runway 5, or in the air. Airborne weather radar would have easily depicted the storm location and intensity. There is no evidence that the phenomenon of attenuation affected N269M's weather radar. Weather related to the storm cell that N269M flew near before the accident did not cause the accident.

### G. *Cause of the Accident*

The cause of the accident was most likely spatial disorientation suffered by Mr. Mintz after entering IMC conditions. Mr. Mintz inadvertently steered N269M into a steep turn—approximately twice the standard rate turn—which then developed into a steep spiral and went out of control. Mr. Mintz was unable to recover control of the aircraft before it crashed. The contributing factors most likely included fatigue (having flown seven hours during the day and night before); and the stress of flying in IMC.

## II. *Conclusions of Law*

### A. *Federal Tort Claims Act*

■ This action is brought pursuant to the Federal Tort Claims Act (FTCA), 28

U.S.C. § 2671, *et seq.* Jurisdiction and venue properly lie with this Court under 28 U.S.C. § 1346(b) and 28 U.S.C. § 1402(b), respectively. Under the FTCA, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his employment under circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Under the FTCA, the "whole law," including the choice of law rules, of the state where the alleged act or omission occurs governs the rights and liabilities of the parties. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961); *Brooks v. United States,* 695 F.2d 984 (5th Cir.1983). This action arises out of an aircraft accident that occurred at Delray Beach, Florida while under the control of an air traffic controller in Palm Beach, Florida. The substantive law of Florida controls.

## B. *Discretionary Function*

 There is a "discretionary function" exception to the FTCA which states: (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a). The intent of the discretionary function exception is "to encompass (in the act's exceptions) the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*

*(Varig Airlines),* 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The discretionary function exception applies to decisions made at all levels of a federal government organization. *United States v. Gaubert,* 499 U.S. 315, 316, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) ("It is the nature of the conduct rather than the status of the actor that governs whether the exception applies."). The Supreme Court has provided a two-pronged test to determine whether or not the discretionary function exception applies. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). In the first prong a court must determine whether the employee taking an action had a choice (discretion) in his or her course of action. If so, then the exception may apply. If, however, the employee was constrained by a federal statute, regulation or policy that prescribed a specific course of action and left the employee with no discretion, then the exception cannot apply. If the first prong is satisfied, a court must then determine if the discretion exercised is the type the exception was designed to shield. The exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz,* 486 U.S. at 537, 108 S.Ct. 1954. Thus, if an employee taking an action had a choice, and if that action involved the permissible exercise of public policy, then the discretionary function exception applies. When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. Plaintiffs have the burden to show discretionary function exception does not apply once asserted by the government. *OSI, Inc. v. United States,* 285 F.3d 947, 951 (11th Cir.2002).

### C. *Pilot Responsibility*

 The Federal Aviation Regulations have the force and effect of law. *Tilley v. United States,* 375 F.2d 678, 680 (4th Cir. 1967); *United States v. Schultetus,* 277 F.2d 322, 327 (5th Cir.1960). Part 91 of the FARs, entitled "General Operating and Flight Rules," contains several regulations dealing directly or indirectly with emergencies:

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. 14 C.F.R. § 91.3(a).

(b) In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency. 14 C.F.R. § 91.3(b).

(c) When an ATC clearance has been obtained, no pilot in command may deviate from that clearance, except in an emergency, unless an amended clearance is obtained.

(d) 14 C.F.R. § 91.103 (1998) mandates that the pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight.

Air traffic control procedures for operating in the United States are contained in various reference materials, including a quarterly FAA publication called the Airman's Information Manual (AIM). The AIM's purpose, as stated in its Foreword, is "to provide airmen with basic flight information and ATC procedures for use in the National Airspace System of the United States."

The FARs provide that the pilot in command is directly responsible for, and is the final authority as to the operation of his aircraft. 14 C.F.R. § 91.3(a); *Redhead v. United States,* 686 F.2d 178, 182 (3d Cir. 1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983).

 The pilot has "final authority, even over air traffic controllers." *In re Air Crash Disaster at JFK,* 635 F.2d 67, 74 (2d Cir.1980). Even if a controller issues a wrong heading or instruction, the pilot has the "primary duty to avoid a hazard that he himself could or should have perceived." *Jackson v. United States,* 983 F.Supp. 273, at 279, n. 9 (D.Mass.1997), *aff'd* 156 F.3d 230 (1st Cir. 1998) (quoting *In re N–500L Cases,* 691 F.2d 15, 31 (1st Cir.1982)). "It is not enough to say that the pilot and controller are concurrently responsible (for accomplishing a safe flight), they must also be concurrently liable, and one does not necessarily follow the other even if both are found negligent." *Tinkler v. United States,* 700 F.Supp. 1067, 1074 (D.Kan. 1988), *aff'd,* 982 F.2d 1456 (10th Cir.1992); *see also In re Aircrash Disaster at Boston, Massachusetts,* 412 F.Supp. at 989 ("[the] pilot's knowledge of his own, his crew's, and his aircraft's capabilities and limitations, is of preeminent importance in this cooperative situation. None of these matters can be known by ATC."). "[A]ir traffic controllers are not to 'get into the cockpit and fly the plane for the pilot.'" *Id.* at 981.

 Section § 91.103 of 14 C.F.R. mandates that the pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight. This most certainly would include close scrutiny of the precipitation depicted on the pilot's own on-board weather radar display. Pilots are also charged with knowledge of the hazards of weather; before obtaining a private pilot certificate, all pilots are trained to recognize critical weather situations from the ground and in flight, and how to procure and use aeronautical weather reports and forecasts. *See* 14 C.F.R. §§ 61.93(c)(ii) and 61.105(a)(3). Prior to takeoff, the pilot

has the sole responsibility to determine whether it is safe or unsafe to undertake the proposed flight. *Jackson*, 983 F.Supp. at 282. As to whether or not to proceed with a flight, the "ultimate decision is the pilot's, since . . . 'the crew knows the condition of the aircraft, its capabilities and must deal with the unusual and unexpected during flight.'" *Neff v. United States*, 420 F.2d 115, 120 (D.C.Cir.1969), *cert. denied*, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970) (quoting the district court, *Neff v. United States*, 282 F.Supp. 910 (D.D.C. 1968)). Pilots have a continuing duty to be aware of dangers which they can perceive with their own eyes, ears and instruments, *In re Air Crash Disaster at JFK*, 635 F.2d at 74; *In re Air Crash at Dallas/Fort Worth Airport*, 720 F.Supp. 1258, 1280 (N.D.Tex.), *aff'd*, 919 F.2d 1079 (5th Cir. 1989), *cert. denied sub nom. Connors v. United States*, 502 U.S. 899, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991). They must also keep a lookout for adverse weather. *In re Air Crash Disaster at JFK*, 635 F.2d at 74.

 "Whenever ATC issues a vector, a direction, or a clearance to a pilot, which in the pilot's judgment would jeopardize the safety of the aircraft and its occupants, that pilot has an absolute duty to reject the same, to so inform ATC, and to request a new direction." *In re Air Crash at Dallas/Ft. Worth Airport*, 720 F.Supp. at 1290 (internal citations omitted). Pilots have a specific obligation to apprise themselves fully of prevailing and expected weather conditions along the route of flight. *In re Air Crash at Dallas/Ft. Worth Airport*, 720 F.Supp. at 1280. As part of their pre-flight duties, pilots must obtain all available information concerning the flight, including weather reports, weather forecasts, and Notices to Airmen (NOTAMs). *Black v. United States*, 441 F.2d 741, 744 (5th Cir.1971). Pilots cannot ignore weather conditions or disregard other information which they see around them. *Spaulding v. United States*,

455 F.2d 222 (9th Cir.1972). The pilot is responsible for circumnavigating dangerous weather conditions perceptible through his own senses; this includes a duty to interpret and evaluate conditions encountered enroute. *Jackson v. United States*, 156 F.3d 230, 235 (1st Cir.1998). The pilot is required by the FARs to report any emergency to air traffic control and to keep the appropriate ATC facility advised of the flight's progress. 14 C.F.R. § 91.123.

 Pilots are trained to seek assistance from air traffic control in an emergency:

> Pilots who become apprehensive for their safety for any reason should request assistance immediately. Ready and willing help is available in the form of radio, radar, direction finding stations and other aircraft. Delay has caused accidents and cost lives. Safety is not a luxury! Take action!

AIM, Chapter 6, § 6–2(b). As a general rule, the ordinary rules of negligence and due care apply in determining liability in actions arising from the operation of an aircraft. *Spaulding v. United States*, 455 F.2d at 226; *American Airlines, Inc. v. United States*, 418 F.2d 180, 191 (5th Cir. 1969); *United States v. Schultetus*, 277 F.2d 322, 325 (5th Cir.1960); *see Black v. United States*, 441 F.2d 741, 743–44 (5th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *Hensley v. United States*, 728 F.Supp. 716 (S.D.Fla. 1989).

### D. *Flight Services—Weather Briefings*

Because the FAA has undertaken to advise requesting pilots of weather conditions, thereby inducing reliance on its FSS facilities, it owes a duty "to see that the information which it furnishes is accurate and complete." *Norwest Capital Management & Trust Co. v. United States*, 828

F.2d 1330, 1333 (8th Cir.1987). Weather briefers are not required to issue specific weather information; rather they interpret and transmit relevant portions to pilots in summarized form. *Jackson v. United States,* 156 F.3d 230, 235 (1st Cir.1998). When a pilot knows or should know what weather he will encounter in flight, nothing the weather briefer does or fails to do can be the proximate cause of a later crash. *See Bauer v. United States,* No. 00 C 8075 (N.D.Ill. Oct.10, 2002). *See also, Davis v. United States,* 824 F.2d 549, 552, 555–56 (7th Cir.1987) ("Weather briefers are not forecasters." They are "middlemen" transmitting information to pilots from various sources.)

### E. *Air Traffic Control Services*

The Air Traffic Control Manual, FAA Order 7110.65, or ATCM, contains guidelines for air traffic control personnel. This is an internal agency document and, although FAA employees must be familiar with the provisions of the handbook, it does not necessarily follow that any deviation from these guidelines constitutes negligence under the Federal Tort Claims Act. *Kanner v. Ross School of Aviation, Inc.,* 18 Av. Cas. (CCH) 17,934, 17,939 (N.D.Okla.1984).

■■■■■ The ATCM does not set forth mandatory duties with regard to weather information; radar-observed weather information falls under the "additional services" provisions of the ATCM and is to be provided by controllers only "to the extent possible," contingent upon such factors as limitations of radar and higher duty priorities. *Barbosa v. United States,* 811 F.2d 1444, 1447–48 (11th Cir.1987). The controller may be required to provide information not required by the ATCM, but only if extreme danger is reasonably apparent to the controller and not apparent, in the exercise of due care, to the pilot. *Hensley,* 728 F.Supp. at 722 (S.D.Fla. 1989).

The pilot-in-command has the primary and ultimate responsibility for the flight, and must look out for and avoid dangerous weather conditions; the provision of "weather assistance" by ATC is an additional service which is not mandatory. *Mallen v. United States,* 506 F.Supp. 728, 734 (N.D.Ga.1979). Although the duties of pilots and air traffic controllers, under certain circumstances, may be concurrent, the operational control of an aircraft is assigned to the pilot in command, not to the air traffic controller. *Daley v. United States,* 792 F.2d 1081, 1085 (11th Cir.1986); *In re Air Crash at Dallas/Fort Worth Airport,* 720 F.Supp. at 1280; *Texasgulf, Inc. v. Colt Electronics, Co. Inc.,* 615 F.Supp. at 661; 14 C.F.R. § 91.3.

■■■■■ Air traffic controllers are held to a standard of ordinary care with respect to their responsibilities, *Spaulding v. United States,* 455 F.2d at 225–26, and they are required to exercise their best judgment when performing their duties. There is no duty to warn a pilot of a condition that the pilot should already be aware of based on his training, experience and personal observations. *Neff v. United States,* 420 F.2d at 120–22. Controllers are not required to foresee or anticipate unlawful, negligent or grossly negligent acts of pilots. *In re Air Crash at Dallas/Fort Worth Airport,* 720 F.Supp. at 1290; *Davis v. United States,* 643 F.Supp. 67, 77 (N.D.Ill.1986), *aff'd,* 824 F.2d 549 (7th Cir.1987); *In re Air Crash at Metropolitan Airport,* 619 F.Supp. 13, 20 (E.D.Mich.1984), *aff'd per curiam,* 782 F.2d 1041 (6th Cir.1985); *Colorado Flying Academy, Inc. v. United States,* 506 F.Supp. 1221, 1228 (D.Col.1981), *aff'd,* 724 F.2d 871 (10th Cir.1984), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). A controller may rely on the assumption that a pilot knows and will abide by all applicable federal regulations. This

includes information contained in the Airman's Information Manual, FAA advisory circulars, and aeronautical charts. *Hensley,* 728 F.Supp. at 722; *In re Air Crash at Dallas/Fort Worth Airport,* 720 F.Supp. at 1290; *Mallen v. United States,* 506 F.Supp. 728, 735 (N.D.Ga.1979), *aff'd,* 632 F.2d 891 (5th Cir.1981).

### F. *Florida Negligence Law*

■ Under Florida Law, negligence occurs when a person does what a reasonably careful person would not do under like circumstances or fails to do that which a reasonably careful person would do under like circumstances. Fla. Std. J. Inst. (Civ.) 4.1. The standard of care owed the plaintiff will be determined in the context of the relationship between the plaintiff and the defendant at the time of the accident. Fla. Std. J. Inst. (Civ.) 4.2(a) and 4.2(c). Whether the defendant has breached his/her legal duty is a question for the trier of fact. *See Florida Power & Light Company v. Periera,* 705 So.2d 1359, 1361–62 (Fla.1998); *McCain v. Florida Power Corp.,* 593 So.2d 500, 503–04 (Fla.1992); *Napoli v. Buchbinder,* 685 So.2d 46 (Fla. 4th DCA 1996); *Kowkabany v. Home Depot, Inc.,* 606 So.2d 716 (Fla. 1st DCA 1992).

■ The essential elements of a negligence action in Florida are: (1) the existence of a duty or obligation, recognized by law, requiring the defendant to conform to a certain standard of conduct for the protection of others against foreseeable and unreasonable risks of harm; (2) a failure on the defendant's part to conform to that standard, (3) the defendant's breach of duty was *both* an actual and a proximate cause of the plaintiff's injury; and (4) the plaintiff suffered legally cognizable damages as a result of the actor's breach of duty. *See Humphreys v. General Motors Corp.,* 839 F.Supp. 822 (N.D.Fla.1993), affirmed, 47 F.3d 430 (11th Cir.1995) (apply-

ing Florida law); *Paterson v. Deeb,* 472 So.2d 1210, 1214 (Fla. 1st DCA 1985), *review denied,* 484 So.2d 8 (Fla.1986); *Florida Power & Light Company v. Lively,* 465 So.2d 1270, 1273 (Fla. 3d DCA 1985) (*en banc*); *Simon v. Tampa Elec. Co.,* 202 So.2d 209, 213 (Fla. 2d DCA 1967).

■ In order to establish the element of causation in Florida the plaintiff bears the burden of proving that the defendant's act or omission was both a cause in fact and a proximate cause of plaintiff's injury or damage. To establish that a defendant's act or omission was a cause in fact the plaintiff must show that, but for that act or omission, there would have been no injury or damage. *See Stahl v. Metropolitan Dade County,* 438 So.2d 14, 17–19 (Fla. 3d DCA 1983); Fla. Std. J. Instr. (Civ.) 5.1(a).

### III. *CONCLUSION*

Based upon the foregoing and after receiving testimony and examining the record in the entire case, the Court finds in favor of Defendant on all remaining claims. Final Judgment shall be issued by separate order.

### *FINAL JUDGMENT*

THIS CAUSE came for trial before the undersigned on January 6–14, 2003. After hearing and considering all evidence presented at trial, the Court found in favor of Defendants on all remaining claims. An entry of final judgment is now appropriate. Therefore, it is

ORDERED AND ADJUDGED that FINAL JUDGMENT IS HEREBY ENTERED for Defendants and against Plaintiffs. Furthermore, in light of prior settlements, ALL CLAIMS ARE DISMISSED and the case is CLOSED. The

Clerk of Court shall CLOSE this case and DENY any pending motions as MOOT.